STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. VINCENT M. ABBATI, JR., DEFENDANT-APPELLANT AND CROSS-RESPONDENT.

Argued February 20, 1985—Decided June 5, 1985.

420

*Mark E. Roddy* argued the cause for appellant and cross-respondent (*Goldenberg, Mackler & Sayegh,* attorneys).

*Linda K. Calloway,* Deputy Attorney General, argued the cause for respondent and cross-appellant (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HANDLER, J.

This appeal presents the issue whether, and under what authority and standards, a trial court may dismiss an indictment with prejudice after a defendant has been twice tried for the same offense and each prosecution has ended in a mistrial due to a hung jury.

### I.

The defendant, Vincent Abbati, Jr., was indicted and charged in four counts with first degree kidnapping (*N.J.S.A.* 2C:13–1(b)(1)), first degree aggravated sexual assault (*N.J.S.A.* 2C:14–2(a)(3) and (4)), fourth degree unlawful possession of knives (*N.J.S.A.* 2C:39–5(d)), and third degree possession of a knife for an unlawful purpose (*N.J.S.A.* 2C:39-4(d)). Defendant went to trial in June 1982. The complainant testified that on January 17, 1982 the defendant abducted her at knifepoint at approximately 7 a.m. from a bus stop where she was waiting, drove her to a vacant lot, and forced her to engage in sexual intercourse. He then took her to his apartment where defendant's roommate and the latter's girlfriend were present. When defendant left the room, the complainant fled and sought assistance.

The defendant offered a different version. He testified that he offered the complainant a ride because of the cold weather, which she voluntarily accepted, that they smoked marijuana together and engaged in consensual sexual intercourse. Afterward, they returned to his apartment where she met his roommate and his room-mate's girlfriend. She left the apartment when Abbati momentarily went to his bedroom.

The jury deliberated approximately two days before they declared themselves hopelessly deadlocked. This conclusion

came after the court requested that they continue to deliberate. The court then declared a mistrial.

In November 1982 defendant's second trial began before a different trial judge and jury. The State relied upon the same fact witnesses, and their testimony was substantially identical to the first trial. The only noteworthy differences between the two trials were an automobile demonstration of the alleged kidnapping conducted by defense counsel and that the defendant called different character witnesses in his second trial. The jury deliberations in this trial lasted approximately one full day. At one point the jury informed the court of a deadlock; the court instructed the jury to continue deliberating. It soon became apparent that this jury was also hopelessly deadlocked. Another mistrial was declared.

Excluding the relatively minor differences in the defense's case, the trials were virtual duplicates of each other. The State and the defendant were represented by the same attorneys in both trials. No demonstrative evidence presented in either trial definitely corroborated either the State's or the defendant's version of the events. Thus, the jury's determination of guilt *vel non* in each case depended on its evaluation of the credibility of the complainant and defendant on the issue of consent to both asportation and intercourse.

After the second mistrial, Abbati moved for dismissal of the indictment with prejudice. The State argued that the trial court had no power to dismiss an indictment, absent a constitutional violation of the defendant's rights, unless explicitly authorized by statute or court rule, and that there was no such authority in New Jersey. The trial court granted defendant's motion and dismissed the indictment. Relying on *State v. Moriwake*, 65 *Hawaii* 47, 647 *P*.2d 705 (1982), the court determined that a trial court has inherent power to dismiss an indictment, and that after two juries had been unable to reach a verdict, it was appropriate under the circumstances for the

court that had presided over the second trial to exercise that power.

In a split decision, the Appellate Division reversed, 195 *N.J. Super.* 218 (1984), and held that although a trial court has inherent power to dismiss an indictment, it may be exercised only when the court finds a "patent and gross abuse of [prosecutorial] discretion ...." *Id.* at 223. The Appellate Division required the trial court to balance the factors favoring and disfavoring dismissal and further found that the trial court gave no apparent deference to the prosecutor's decision to reprosecute. *Id.* Judge Matthews, dissenting, reasoned that the trial court did not abuse its discretion in dismissing the indictment, and concluded that to allow "retrial *ad infinitum* provided successive juries cannot agree on a verdict is fundamentally unfair, if not bad organic law." *Id.* at 226. The case is before the Court on appeal as of right under *R.* 2:2–1(a)(2). We reverse.

## II.

The State asserts that absent statutory authority, a court may dismiss an indictment with prejudice only when the defendant's constitutional rights have been violated. We therefore consider whether constitutional principles, including double jeopardy, due process, and fundamental fairness, constitute a basis for implying judicial authority to dismiss an indictment following several mistrials.

■ It is, of course, true that a trial court must dismiss an indictment if prosecution would violate the defendant's constitutional rights. *See, e.g., Barker v. Wingo,* 407 *U.S.* 514, 92 *S.Ct.* 2182, 33 *L.Ed.*2d 101 (1972); *State v. Szima,* 70 *N.J.* 196, *cert.* den., 429 *U.S.* 896, 97 *S.Ct.* 259, 50 *L.Ed.*2d 180 (1976) (right to speedy trial); *State v. Barnes,* 84 *N.J.* 362 (1980) (freedom from double jeopardy); *State v. Sutton,* 80 *N.J.* 110 (1979) (freedom from selective prosecution); *State v. Jones,* 183 *N.J.Super.* 172 (App.Div.1982) (right to due process). The double jeopardy

clauses of the federal and state Constitutions, however do not prohibit retrial of a defendant when a prior prosecution for the same offense has ended in mistrial attributable to the inability of the jury to agree on a verdict.

In some sense a defendant is in jeopardy when required to be retried following a mistrial because of a deadlocked jury. However, the jeopardy to which the defendant is exposed is considered a continuation of original jeopardy, which was not terminated by the mistrial. *See Richardson v. United States,* —— *U.S.* ——, 104 *S.Ct.* 3081, 82 *L.Ed.*2d 242 (1984); *Wade v. Hunter,* 336 *U.S.* 684, 69 *S.Ct.* 834, 93 *L.Ed.* 974 (1949); *United States v. Perez,* 22 *U.S.* (9 Wheat.) 579, 6 *L.Ed.* 165 (1924); *State v. Rechtschaffer,* 70 *N.J.* 395 (1976); *State v. Romeo,* 43 *N.J.* 188 (1964), *cert.* den. *Romeo v. New Jersey,* 379 *U.S.* 970, 85 *S.Ct.* 668, 13 *L.Ed.*2d 563 (1965); *State v. Roller,* 29 *N.J.* 339 (1959).

■ The seminal decision construing the federal double jeopardy clause, *U.S. Const.* amend. 5, in the context of a mistrial due to the failure of the jury to agree on a verdict is *United States v. Perez,* 22 *U.S.* (9 Wheat.) 579, 6 *L.Ed.* 165 (1824). The Supreme Court ruled that courts have the authority to discharge juries "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated." *Id.* at 580, 6 *L.Ed.* at 165. The Court concluded that "manifest necessity" justified the discharge of a jury unable to reach a verdict, and therefore retrial did not offend the Constitution.[1] *See also Wade v. Hunter, supra,* 336 *U.S.* 684, 688–89, 69 *S.Ct.*

---

[1]The requirement of manifest necessity or service of public justice must be met before a mistrial may be properly declared for any reason, lest reprosecution be barred. *See e.g., Illinois v. Somerville,* 410 *U.S.* 458, 93 *S.Ct.* 1066, 35 *L.Ed.*2d 425 (1973) (mistrial due to fatally deficient indictment does not bar retrial upon new, sufficient indictment); *Wade v. Hunter,* 336 *U.S.* 684, 69 *S.Ct.* 834, 93 *L.Ed.* 974 (1949) (absence of witnesses may justify discontinuance of trial).

834, 836–37, 93 *L.Ed.* 974, 978 (1949), (allowing a defendant to go free whenever the trial failed to end in a final judgment "would create an insuperable obstacle to the administration of justice in many cases in which there is no semblance of the type of oppressive practices at which the double-jeopardy prohibition is aimed. . . .").

■ Our State Constitution's prohibition on double jeopardy is no less clear in allowing retrial after a mistrial due to a deadlocked jury. *See N.J. Const.* (1947) art. I, para. 11 ("No person shall, after acquittal, be tried for the same offense."); *City of Newark v. Pulverman,* 12 *N.J.* 105, 110 (1953). It would therefore be misleading to suggest that the State or federal double jeopardy clauses would bar retrial in this case. Consequently, constitutional double jeopardy principles do not constitute the basis for implying judicial authority to dismiss an indictment following two mistrials in the circumstances presented.

■ In considering whether constitutional precepts of due process or fundamental fairness may be the basis for an implied judicial authority to dismiss an indictment after several mistrials, we are brought immediately to a concomitant consideration of other policy concerns that bear materially upon the existence and nature of such judicial authority. We are satisfied that precepts of fundamental fairness, together with the judiciary's need to create appropriate and just remedies, and its general responsibility to assure the overall efficient administration of the criminal justice system, confirm an inherent power in a trial court to dismiss an indictment with prejudice following general mistrials attributable to repeated jury deadlocks.

■ This analysis requires an examination of the scope and nature of the judicial power. The New Jersey Constitution vests judicial power in the Supreme Court and all inferior courts. *See N.J. Const.* (1947) art. VI, § 1, para. 1. The constitutional judicial power embraces ancillary inherent powers. The inherent powers of our courts are not defined by the

judicial article, and any exhaustive definition of these powers is practically impossible. It is "the imperfection of human institutions which gives rise to our notion of inherent power. It is simply impossible for a judge to do nothing but judge; the Legislature to do nothing but legislate; a governor to do nothing but execute the laws." *In re Court Reorganization Plan of Hudson County,* 161 *N.J.Super.* 483, 491 (App.Div. 1978); aff'd 78 *N.J.* 498 (1979) (mem.); *see Knight v. Margate,* 86 *N.J.* 374, 389–91 (1981) (legislation prohibiting conflicts of interest and its application to full-time municipal court judges does not encroach on constitutional judicial power of the courts).

■ Despite the exiguity of the judicial article, an unbroken conceptual thread running throughout our decisions applying that article is that the judicial power imports the power to fashion needed and appropriate remedies. The judicial article reposes in our courts the power to create, mold and apply remedies once jurisdiction is invoked. *See generally Robinson v. Cahill,* 70 *N.J.* 155 (1976), injunction dissolved, 70 *N.J.* 464 (1976) (mem.). This is particularly true in the criminal justice field. "The court's power to fashion remedies in the realm of criminal justice is unquestioned." *State v. Carter,* 64 *N.J.* 382, 392 (1974), overruled on other grounds, *State v. Krol,* 68 *N.J.* 236 (1975). *See, e.g., State v. McCrary,* 97 *N.J.* 132, 139–40 (1984) (trial courts authorized to hear and decide capital murder defendants' factual challenge to sufficiency of evidence supporting aggravating factors prior to trial notwithstanding presumption of validity accorded to prosecutor's discretion in giving notice of intent to prove aggravating factors); *State v. Gaffey,* 92 *N.J.* 374, 383–84 (1983) ("It has long been recognized that the judiciary has the inherent power to dismiss criminal charges, particularly where the prosecution of charges would violate the defendant's constitutional rights." [citations omitted] ); *State v. Leonardis,* 73 *N.J.* 360, 369 (1977) (Supreme Court's rule-making power includes power to create pretrial intervention program and order diversion of defendant); *Ada-*

mo v. McCorkle, 13 N.J. 561, 563–64 (1953), cert. den., 347 U.S. 928, 74 S.Ct. 531, 98 L.Ed. 1080 (1954) (court has inherent power to suspend sentence and order the defendant into probation and to revoke probation and re-impose prison sentence when defendant violates terms of probation).

The courts' inherent powers have been used to dismiss indictments in several circumstances. See, e.g., State v. Laganella, 144 N.J.Super. 268 (App.Div.1976), appeal dismissed, 74 N.J. 256 (1976); State v. Hunt, 184 N.J.Super. 304 (Law Div.1981) (failure to comply with discovery rules); State v. Cichetto, 144 N.J.Super. 236 (App.Div.1976) (unreasonable delay in presentment of charges to grand jury); State v. Hart, 139 N.J.Super. 565 (App.Div.1976) (grand jury misconduct). Our Rules of Court to some extent codify this inherent power. See, e.g., R. 3:25-1 (providing for dismissal of indictment by judge or prosecutor); R. 3:25-3 (dismissal of indictment for delay). The inherent judicial power to dismiss an indictment in some instances has also been mirrored in the Criminal Code. See, e.g., N.J.S.A. 2C:1-1(c)(3) (providing for dismissal if offense is no longer an offense under the Code); N.J.S.A. 2C:4-11 (providing for bar to prosecution due to youth of defendant).

■ Therefore, although the question whether a trial court may dismiss an indictment with prejudice in the circumstances here presented is a question of first impression in this State, it is beyond debate that our courts possess such power, within the bounds of properly exercised discretion. That discretion in the final analysis must be informed and guided by considerations of fundamental fairness, as well as the judiciary's responsibility for the proper overall administration of the criminal justice system.

Fundamental fairness can be viewed as an integral part of the right to due process. See, e.g., Ake v. Oklahoma, —— U.S. ——, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (requirement of fundamental fairness grounded in fourteenth amendment's due process guarantee); Moran v. Ohio, —— U.S. ——, 105 S.Ct.

350, 83 *L.Ed.*2d 285 (1984) (mem.) (notions of fundamental fairness are at the heart of Anglo-American law and independently influence the construction and application of state criminal code) (Justices Brennan and Marshall, dissenting from denial of *certiorari* ); *California v. Trombetta,* —— *U.S.* ——, 104 *S.Ct.* 2528, 81 *L.Ed.*2d 413 (1984) (under due process clause of fourteenth amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness). It may also be considered a penumbral right reasonably extrapolated from other specific constitutional guarantees. *See, e.g., Barker v. Wingo, supra,* 407 *U.S.* 514, 92 *S.Ct.* 2182, 33 *L.Ed.*2d 101 (constitutional right of speedy trial includes considerations of prejudice and fairness to defendant); *United States v. Agurs,* 427 *U.S.* 97, 96 *S.Ct.* 2392, 49 *L.Ed.*2d 342 (1976) (prosecutor has constitutional duty to volunteer exculpatory evidence to the defense); *Bearden v. Georgia,* 461 *U.S.* 660, 103 *S.Ct.* 2064, 76 *L.Ed.*2d 221 (1983) (fundamentally unfair to revoke probation automatically if probationer has made all reasonable efforts to pay fine without considering whether adequate alternative methods of punishment are available). Regardless of its source, fundamental fairness is a settled repository of rights of the accused. *See State v. Tropea,* 78 *N.J.* 309 (1978); *State v. Gregory,* 66 *N.J.* 510 (1975).

■ The anxiety, vexation, embarrassment, and expense to the defendant of continual reprosecution where no new evidence exists is a proper subject for the application of traditional notions of fundamental fairness and substantial justice.

> The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power shold not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.
>
> [*Green v. United States,* 355 *U.S.* 184, 187–88, 78 *S.Ct.* 221, 223–24, 2 *L.Ed.* 2d 199, 204 (1957).]

Several courts have relied on their inherent or express power to dismiss an indictment with prejudice where they have determined that reprosecution would violate precepts of fundamental fairness. In *United States v. Ingram*, 412 *F.Supp.* 384 (D.D.C. 1976), for example, the court dismissed the indictment after the defendant was tried twice for armed robbery, and the juries voted 10–2 and 11–1 for acquittal, respectively. The court wrote that dismissal of the indictment was

> simply a matter of fair play. The government has no new proof; it simply wants another chance.... Apparently, the Government, always a hard loser, simply wishes to keep pressing so long as juries disagree in the hope that a conviction will result....
>
> Here is a man in jail now more than seven months primarily because of an offense which the Government is unable to convince a jury he committed. If another trial takes place there is every reason to believe the jury will again be divided or will acquit.... Under the circumstances of the cases the verdicts themselves indicate a reasonable doubt in the minds of a substantial majority of the jury members who have heard the evidence. To permit a retrial, after 21 of 24 jurors have already refused to convict, is to ignore the reasonable doubt standard.... The judgment of the Court or the prosecutor as to the weight of the evidence is, under these circumstances, not entitled to outbalance the obvious. [*Id.* at 385–86.]

In *State v. Moriwake, supra*, 65 *Hawaii* 47, 647 *P.*2d 705, relied upon by the trial court, the Hawaii Supreme Court affirmed the dismissal of an indictment for manslaughter by a trial court after two hung jury mistrials. The court found the power to dismiss in the judicial article of the Hawaii Constitution, reasoning that "[t]hat aspect of the judicial power which seeks to 'administer justice' is properly invoked when a trial court *sua sponte* dismisses an indictment with prejudice following the declaration of one or more mistrials because of genuinely deadlocked juries, even though the defendant's constitutional rights are not yet implicated." *Moriwake*, 65 *Hawaii* at 55, 647 *P.*2d at 711–12.

A similar conclusion was reached in *State v. Witt*, 572 *S.W.*2d 913 (Tenn.1978). There, the Tennessee Supreme Court affirmed a dismissal of an indictment for murder after three mistrials, observing that the trial court had inherent authority to terminate the prosecution in the exercise of sound judicial

discretion where repeated, error-free trials resulted deadlocked juries and the chances for future conviction were extremely unlikely. Likewise, in *People v. Kirby*, 92 *App.Div.*2d 848, 460 *N.Y.S.*2d 572 (App.Div.1983) (mem.), appeal dismissed *sub nom. People v. Franklin*, 63 *N.Y.*2d 1033, 484 *N.Y.S.*2d 814, 473 *N.E.* 2d 1188 (1984), the Appellate Division of the New York Supreme Court found that a trial court has discretionary power to dismiss an indictment after a hung jury, grounding its decision on the court's ultimate responsibility to assure the integrity of its judgment and the principle of the separation of powers. *Id.* at 849, 460 *N.Y.S.*2d at 573, citing *State v. Witt, supra.* The New York court found that the trial court had abused its discretion in dismissing the murder indictment because it did not give the reasons for its action. *Id.* at 849, 460 *N.Y.S.*2d at 574.

Two states have indicated that their courts are without authority to dismiss an indictment with prejudice. In one, that decision rested on the formalism that no specific authorization to do so was contained in the court rules or case law. *See State v. Sherrod*, 383 *So.*2d 752, 753 (Fla.App.1980). *But see State v. Romano*, 300 *So.*2d 22 (Fla.App.1974); *State v. Fattorusso*, 228 *So.*2d 630 (Fla.App.1969) (both recognizing inherent right of trial court to dismiss an action because of non-compliance with its orders in the interests of orderly administration of justice). In *State v. Braunsdorf*, 98 *Wis.*2d 569, 297 *N.W.*2d 808 (1980), the Wisconsin Supreme Court ruled in a 4–3 decision that a Wisconsin trial court had no power to dismiss an indictment because the prosecutor was not prepared to proceed when the day set for trial arrived, unless the defendant's right to a speedy trial had been violated. *Braunsdorf* is distinguishable, however, because jeopardy had not yet attached. The trial court was found to have abused its discretion in prematurely dismissing the indictment. *Id.* at 576, 297 *N.W.*2d at 812. Completely different considerations exist in the case before us.

We have mentioned that judicial responsibility for the proper administration of criminal justice also gives rise to the inherent power to dismiss an indictment in appropriate circumstances.

This Court's authorization and the subsequent implementation of pretrial intervention programs, *R.* 3:28, is illustrative of that judicial responsibility. *See State v. Leonardis*, 71 *N.J.* 85, 89 (1976) (*Leonardis I*). See *N.J.S.A.* 2C:43–12 to 22 (Criminal Code codifies pretrial intervention program). The judicially-created Intensive Supervision Program is another example of the courts' inherent responsibility and power to manage efficiently the criminal justice system. In response to the overcrowding of our prisons, the judiciary proposed and subsequently authorized a program of conditional release from custody—a form of intermediate punishment between incarceration and probation—for certain carefully screened non-violent offenders. *See* Judicial Conference Planning Committee Final Report 85 (1982); *R.* 3:21–10(e). We note that this program was endorsed by the Executive branch. *See* Office of the Governor, Prison Overcrowding: A Plan of Action 9–10 (1982).

These examples of the courts' exercise of their power to administer the criminal justice system assist in answering the further argument of the State that recognition of an inherent judicial power to dismiss an indictment with prejudice would overstep the separation of powers. The argument posits that the court's dismissal of an indictment may be contrary to the public's interest, embodied in the prosecutor's decision to reprosecute, in seeing that criminal prosecutions proceed to a final judgment. In a similar vein, the Appellate Division majority below ruled that although trial courts have inherent power to dismiss an indictment with prejudice, it can be exercised only when the court finds a "patent and gross abuse of [prosecutorial] discretion" by the State. *Abbati*, 195 *N.J.Super.* at 223. This argument misperceives the role of the prosecutor and the intended balance of powers between the prosecutor and the courts.

■ The strength and independence of the prosecutor's office has always been respected and accorded wide deference. Nevertheless, historically it has never been regarded as free

from judicial supervision and control. *See State v. Leonardis, supra*, 71 *N.J.* at 97; *In re Investigation Regard Ringwood Fact Finding Committee*, 65 *N.J.* 512, 516–19 (1974). *See generally In re Application of the Burlington Cty. Bd. of Chosen Freeholders For An Investigation of the Office of Sheriff*, 99 *N.J.* 90, 98–101 (1985) (affirming that sheriff is county employee subject to court-supervised investigation although he is state officer as well). A prosecutor could not enter a *nolle prosequi* dismissal of an indictment without judicial approval, for example, although that rule has been amended to allow for administrative dismissal by the prosecutor prior to trial with a statement of reasons to the court and notice to the defendant. *See R.* 3:25–1. Dismissal of an indictment has always been proper where a prosecutor has abused his discretion. *See State v. LeVien*, 44 *N.J.* 323, 327 (1965). Indeed, the prosecutor is a quasi-judicial officer. His or her duty is to seek justice; the duty is not merely to prosecute the guilty but to protect the innocent as well. *See* ABA, Standards Relating to the Prosecution Function and the Defense Function 1.1(c) 25, 44 (Tent. Draft 1970). Thus, the prosecutor's decision to reprosecute is not immune from judicial supercession even absent a finding of abuse of prosecutorial discretion.

Although the trial court must carefully consider the prosecutor's decision to reprosecute in reaching its conclusion regarding dismissal, and defer to it when the balance does not otherwise compel dismissal, the prosecutor's discretion is itself subject to the power of the court. *See State v. Leonardis, (Leonardis II)*, 73 *N.J.* 360, 377–80 (1977); *Ringwood Fact Finding Commission, supra*, 65 *N.J.* at 516. The separation of powers is not an end in itself, but a general principle intended to ensure that the system of checks and balances remains vital. *See State v. Leonardis, (Leonardis II)*, 73 *N.J.* at 369–71. *Ringwood Fact Finding Committee, supra*, 65 *N.J.* at 519. We perceive no upset in the balance of powers stemming from our decision. Thus, a trial court may dismiss

an indictment with prejudice when the discretion to do so is soundly exercised.

## III.

We next address the guidelines by which a trial court may properly dismiss an indictment. The facts in this case enable us to review the relevant factors and fashion an appropriate standard to govern the court's discretionary authority.

We hold that a trial court may dismiss an indictment with prejudice after successive juries have failed to agree on a verdict when it determines that the chance of the State's obtaining a conviction upon further retrial is highly unlikely. The trial court must carefully and expressly consider the following factors, which shall govern its ultimate decision whether to dismiss the indictment: (1) the number of prior mistrials and the outcome of the juries' deliberations, so far as is known; (2) the character of prior trials in terms of length, complexity, and similarity of evidence presented; (3) the likelihood of any substantial difference in a subsequent trial, if allowed; (4) the trial court's own evaluation of the relative strength of each party's case; and (5) the professional conduct and diligence of respective counsel, particularly of the prosecuting attorney. The court must also give due weight to the prosecutor's decision to reprosecute, assessing the reasons for that decision, such as the gravity of the criminal charges and the public's concern in the effective and definitive conclusion of criminal prosecutions. Conversely, the court should accord careful consideration to the status of the individual defendant and the impact of a retrial upon the defendant in terms of untoward hardship and unfairness.

The standard does not entail a test of the legal sufficiency of the evidence. In this case, for instance, the State adduced sufficient evidence to warrant Abbati's conviction; it did not persuade the juries that Abbati was guilty beyond a reasonable doubt. In those few prosecutions in which the

State's evidence is adequate to survive a motion for dismissal for insufficient evidence, but successive juries have refused to convict, the trial court must explore the State's case and determine whether dismissal is nonetheless compelled by weighing all relevant considerations. Thus, we do not undertake to define all the circumstances in which it would be proper to order a dismissal, just as it is infeasible to suggest which factors would be weightier in any particular case. The decision is left to the sound judgment of our trial courts to be exercised in the unique circumstances arising in such cases.

 An appellate court reviewing the decision of a trial court to dismiss an indictment with prejudice must ensure that the correct standard was employed by the trial court. *See State v. Steele,* 92 *N.J.Super.* 498, 507 (App.Div.1966). Presupposing that that threshold is met, the trial court's decision is entitled to deference for the obvious reasons that the trial court saw the witnesses and heard the testimony. The decision should be reversed on appeal only when it clearly appears that the exercise of discretion was mistaken.

## IV.

 In this case, the trial judge who presided over the second prosecution and ordered the dismissal touched upon several of the factors that we deem essential. He considered the number of mistrials, the character of the prior trials in terms of complexity and similarity of evidence presented, the likelihood of any substantial difference in the evidence presented at a subsequent trial, if allowed, and, finally, the diligence exercised by each attorney. He also noted the gravity of the crimes, commenting that "with the exception of murder, [rape and kidnapping are] as serious as criminal charges can be." We cannot be certain, however, that the trial judge independently determined the relative strength of each party's case or carefully weighed the chances that a third trial would also end in a mistrial, although his opinion impliedly suggests that it

would since he concluded that "[t]here is no indication that a third trial will proceed in a manner different than the preceding two nor is there any reason to believe that a more homogeneous jury will be selected." We are similarly uncertain as to whether and in what manner the trial court gave weight to the prosecutor's decision to reprosecute and the special impact of another trial upon the defendant.

Consequently, we must remand the case to the trial court for a full determination of whether the indictment should be dismissed according to the standard enunciated herein. Accordingly, the decision of the Appellate Division is reversed and the case is remanded for further proceedings consistent with this opinion.

For *reversal and remandment* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance* —None.