793 A.2d 861 (2002)
349 N.J. Super. 464
STATE of New Jersey, Plaintiff-Respondent,
v.
Warren JENKINS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted December 18, 2001.
Decided April 2, 2002.
*863 Peter A. Garcia, Acting Public Defender, attorney for appellant (Sylvia Orenstein, Assistant Deputy Public Defender, of counsel and on the brief).
John J. Farmer, Jr., Attorney General, attorney for respondent (Jordana Jakubovic, Deputy Attorney General, of counsel and on the brief).
Before Judges WEFING, LESEMANN and LANDAU.
*862 The opinion of the court was delivered by WEFING, J.A.D.
Following a third extended trial, defendant was convicted of aggravated manslaughter as a lesser included offense of murder, N.J.S.A. 2C:11-4; felony murder, N.J.S.A. 2C:11-3a(3); two counts of carjacking, N.J.S.A. 2C:15-2; robbery, N.J.S.A. 2C:15-1; two counts of conspiracy, N.J.S.A. 2C:5-2; one count of aggravated assault, N.J.S.A. 2C:12-1b(4); two counts of possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4a; two counts of unlawful possession of a handgun, N.J.S.A. 2C:39-5b; and one count of receiving stolen property, N.J.S.A. 2C:20-7. Two of the convictions (felony murder and aggravated assault) were for Graves Act offenses, N.J.S.A. 2C:43-6c. At sentencing, the trial court granted the State's motion for an extended term under N.J.S.A. 2C:44-3d. For felony murder, the trial court sentenced defendant to life in prison, with a thirty-five year period of parole ineligibility. The two carjacking convictions were first-degree crimes; for those offenses the trial court sentenced defendant to two concurrent thirty-year terms, with a fifteen-year period of parole ineligibility but directed that sentence be served consecutively to the sentence for felony murder. All other sentences were made concurrent. Defendant's aggregate sentence is thus life in prison, with a fiftyyear period of parole ineligibility. Defendant appeals his convictions and sentence. We have reviewed the record on appeal in light of the contentions advanced and are *864 satisfied that defendant's convictions and sentence should be affirmed.

I
Defendant, with an accomplice Thomas Cross, went on a crime spree in Newark and the surrounding area in the spring and summer of 1995. We have already affirmed his convictions and sentences for incidents which occurred in April and June of that year. State v. Jenkins, 321 N.J.Super. 124, 728 A.2d 293 (App.Div.1999); State v. Jenkins, A-818-98, decided July 18, 2000. This appeal follows defendant's conviction for the shooting death of John Deventer on July 14, 1995 in Fairmount Cemetery in Newark.
John Deventer lived in Hanover, New Jersey. He had, several months earlier, retired as the chief of the Hanover police department. George and Elsie Wolf were friends and neighbors of the Deventers. The Wolfs were in their eighties and unable to drive any longer. Deventer would assist the Wolfs in a variety of ways, including regularly driving them, together with a gardener, to Fairmount Cemetery to see to the maintenance of a tract known as the "Hoffman plot" for which the Wolfs were responsible.
Deventer went to the Wolfs' home on the morning of July 14. He then drove the Wolfs and the gardener to the cemetery, using the black Lincoln Town Car the Wolfs owned. When they arrived at the cemetery, they dropped off the gardener and then drove to Giordano's bakery. The Wolfs and Deventer were regular customers at the bakery on their weekly trips to Newark and Mr. Wolf had called ahead to place an order for particular breads and rolls. When they arrived, Monica Giordano packed the order for him in the bakery's regular white bags and Mr. Wolf placed it in a satchel he had brought with him. He then put the satchel into the rear of the car.
Deventer then drove back to the cemetery to pick up the gardener. He parked the car, turned off the engine and, taking the keys, walked over to the area where the gardener was working. Mr. and Mrs. Wolf remained in the car, he in the front, she in the rear.
A few minutes later, Mr. Wolf saw a thin black man wearing a colorful shirt some 200 feet away; the man was pointing at the Town Car and calling to someone else. A second black man appeared and the two conversed briefly and then moved out of his field of vision. Suddenly, the front passenger door of the car was opened; Mr. Wolf felt something pressed against his head and the man with the flowered shirt he had seen a few moments earlier was standing there. He ordered Mr. Wolf out of the car, saying if he made any noise he would "blow [his] brains out." The other man had opened Mrs. Wolf's car door and the elderly couple was forced out of the car and then told to wait.
The two assailants then approached Deventer and the gardener who, by then, were returning to the car. The two demanded the keys to the car and Deventer resisted. A struggle ensued and Deventer shouted, "I am a cop." One of the attackers told the man with the gun, "Shoot him" and the other immediately complied, shooting Deventer in the abdomen. Deventer collapsed and the two assailants stole the car keys, ran back to the Town Car and drove off. Mr. Wolf sent his wife to summon help; Deventer died in his arms.
That same day, Rose Weinbaum took her elderly father to the doctor in Maplewood, accompanied by her two-year-old daughter. When they came out of the doctor's office, she helped her father into the car and turned on the engine and the air-conditioning. As she was placing her *865 daughter in the car seat, a tall, thin black man approached with a gun and ordered everyone out of the car. Her father tried to resist and was knocked to the ground. The man then drove off in Ms. Weinbaum's, car, a white Honda. Ms. Weinbaum noticed that the thief seemed to be following a red car which had pulled out of a nearby parking space. She jotted down the license plate of that red car as the two vehicles sped away. It was later determined that the red car had been stolen several days earlier at gun point from the driveway of Michael Calabria in West Orange.
Following the report of the Weinbaum carjacking, police set up surveillance to look for the car. It was spotted later that afternoon in Newark. Police followed it and arrested the occupants, a man and a woman. The man, later identified as Thomas Cross, matched the description of the carjacker supplied by Michael Calabria and Rose Weinbaum. Both Calabria and Weinbaum later positively identified Cross from a photo array.
Police went to the address Cross had supplied, an apartment in Newark belonging to one Edward Barden. Barden confirmed that Cross had been staying with him. He said he had seen Cross driving a white Honda. He gave police permission to search the apartment; the search turned up a .38 caliber handgun Barden said belonged to Cross. Barden also said that Cross's friend, defendant Warren Jenkins, had been at the apartment earlier looking for Cross but left when he heard Cross had been arrested. According to Barden, Jenkins had been driving a red car.
Later that night, police discovered the Town Car belonging to the Wolfs parked on Van Ness Place in Newark. No fingerprints could be found in the car. The next day, July 15, Lafayette Kollick, who lived on Van Ness Place, contacted the police after he read in the newspapers of the Deventer killing. He told the police that on the afternoon of the 14th, he had been sitting in a van in front of his house when a black Town Car pulled up and parked behind him. He noticed that the man who got out of the Town Car had socks on his hands. A small red car pulled up behind the Town Car and the man got into it and it drove away. Kollick later identified defendant from a photo array as the man he saw exit from the Town Car.
Also on the 15th, police stopped at the home of Gary Jenkins, whom they understood to be defendant's cousin. They met Evelyn Cruse, Gary's girlfriend. She told the police that defendant had been there the day before, driving a small red car. She said defendant had given her a quantity of bread and rolls, packed in white bakery bags. They were later identified as the goods that Mr. Wolf had purchased at Giordano's.
After leaving that residence, the police were driving to another location to pursue the investigation when they spotted Calabria's red car parked on the street. Deventer's rosary beads and St. Jude medal were found in the car. Defendant was arrested later that night, when police found him hiding in a basement at 413 Lyons Avenue in Newark.
As part of their investigation of the Deventer killing, police spoke to all the employees of Fairmount Cemetery who were working July 14. Edward Fisher told the police that he had been on his way to lunch, near the site of the Hoffman plot, when he passed a black man wearing shorts and carrying a shirt. He picked defendant's picture from a photo array as the individual he had seen.
Police received a report of a second shooting in the cemetery which had occurred *866 at about the same time as Deventer was killed, although some distance away. In that incident, Mr. Ortiz and Mr. Rodriguez said a black man wearing a brightly colored flowered shirt shot at them. The bullet in that incident entered a car and the size of the hole indicated a large caliber weapon. The bullet that killed Deventer, on the other hand, was a small caliber. Through later investigation, the police concluded the two incidents were unrelated. They determined that the second shooting was done by Willie Drewery who had dated Mr. Ortiz's daughter. Drewery and Ortiz had had disputes over that relationship.
During their initial investigation, however, the police were uncertain whether the two shootings were connected. Thus they showed several witnesses photo arrays containing pictures of Cross, Jenkins and Drewery. When Mr. Wolf was shown the arrays, he picked out Drewery's picture as most resembling the man with the gun who shot Deventer. The newspaper carried a report of the arrest of defendant and Cross and included pictures as part of its story. When Mr. Wolf saw the newspaper report, he identified Cross as one of the assailants. Mr. Wolf testified, however, that he suffered from macular degeneration and thus had poor vision. Neither Mrs. Wolf nor the gardener were able to contribute anything on the issue of identification.
Jenkins was tried three times for these crimes. The first two trials resulted in hung juries; the third jury convicted defendant on all counts, as noted at the outset of this opinion.

II
On appeal, Jenkins raises the following arguments:
POINT I
DEFENDANT'S RETRIAL ON COUNTS SEVEN(a), EIGHT, NINE ELEVEN, TWELVE, FOURTEEN, SIXTEEN, SEVENTEEN AND EIGHTEEN OF THE INDICTMENT VIOLATED HIS FEDERAL AND STATE DOUBLE JEOPARDY RIGHTS, AND THE COURT BELOW ERRED IN REFUSING TO DISMISS THOSE COUNTS. U.S. CONST., AMEND. V; N.J. CONST., ART. I, ¶ 11.
POINT II
FUNDAMENTAL FAIRNESS REQUIRED THAT THE COUNTS ON WHICH THE JURY IN THE FIRST TRIAL ANNOUNCED AN ACQUITTAL BE DISMISSED.
POINT III
BECAUSE IDENTIFICATION WAS THE CRITICAL TRIAL ISSUE AND THE PROCEDURES UTILIZED BY THE POLICE WERE IMPERMISSIBLY SUGGESTIVE, THE ADMISSION OF THE EQUIVOCAL IDENTIFICATIONS OF WITNESSES FISHER AND KOLLICK DEPRIVED MR. JENKINS OF A FAIR TRIAL. (U.S. CONST., AMENDS. VI, XIV; N.J. CONST., (1947), ART. I, ¶ ¶ 1, 9, 10).
POINT IV
THE ADMISSION INTO EVIDENCE, OVER THE DEFENSE'S OBJECTION, OF WITNESS BARDEN'S STATEMENT THAT HE HAD SEEN THE DEFENDANT ON PRIOR OCCASIONS WITH A REVOLVER OF UNKNOWN CALIBER, WAS PREJUDICIAL AND DEPRIVED DEFENDANT OF A FAIR TRIAL.
POINT V
THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING DEFENDANT'S MOTION FOR A CHANGE OF VENUE OR FOR AN ADJOURNMENT TO ALLOW THE *867 EFFECT OF INFLAMMATORY PUBLICITY TO ABATE, THUS DEPRIVING HIM OF HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY. U.S. CONST., AMEND. VI, XIV; N.J. CONST. (1947), ART. 1, ¶ 10.
POINT VI
THE PROSECUTOR'S COMMENTS DURING SUMMATION WERE IMPROPER AND SO PREJUDICIAL AS TO DENY DEFENDANT A FAIR TRIAL AND REQUIRE THE REVERSAL OF HIS CONVICTIONS. U.S. CONST., AMEND. XIV; N.J. CONST., (1947), ART. 1, ¶ 10.
A. COMMENTS BY THE PROSECUTOR IMPROPERLY SHIFTED THE BURDEN OF PROOF AND IMPLICATED DEFENDANT'S RIGHT TO REMAIN SILENT.
B. THE PROSECUTOR MISREPRESENTED THE DEFENSE'S POSITION.
C. WITHOUT ANY SUPPORT IN THE RECORD, THE PROSECUTOR STATED THAT ONE OF THE KEY WITNESSES TESTIFIED AS HE DID OUT OF FEAR.
POINT VII
THE SENTENCE IMPOSED ON THE DEFENDANT WAS GROSSLY EXCESSIVE AND THE RESULT OF IMPROPER CONSIDERATIONS.

A
Understanding defendant's first point requires that we set forth in some detail the events surrounding defendant's prior trials.
Defendant's first trial commenced on November 1, 1996, and ended on November 27, 1996 after four days of jury deliberations. The initial deliberations, which commenced on Friday, November 22, were not untoward. The trial court answered the several questions posed. Immediately after the lunch recess on Monday, November 25, the jury told the trial court it was deadlocked on a number of charges, including those of conspiracy, robbery, murder, felony murder, and carjacking. The trial court asked the jurors to resume deliberations, with a fresh mind and they did so. They deliberated for the balance of that day and into Tuesday, November 26. Again, the trial court responded without incident to their several questions.
Midway through the afternoon session, the first significant difficulty arose. One of the jurors, who was pregnant, sent out a note to the trial court, expressing concern about the stress she was experiencing. With the consent of counsel, the trial court spoke to the juror who then returned to the jury room to discuss ending deliberations for the day. The panel concurred and recessed for the day.
The jurors returned for a fourth day on Wednesday, November 27. A little after 10 a.m. the panel sent the first of several notes to the trial court which expressed doubts about the capacity of one of the jurors to understand and participate in the deliberations. The trial court asked for further explanation and eventually spoke to that juror alone, on the record and in the presence of counsel. The court encouraged the jurors to continue their deliberations as the notes became more insistent that one juror was not following the process; one note said that the juror at issue was "not fair or impartial." At one point, the trial court spoke to each of the jurors alone, on the record and in the presence of counsel. All said they agreed with that description of the particular juror.
Toward the end of the day, the juror identified as a problem asked to speak to the trial court and indicated some uncertainty *868 about the terms "guilty" and "not guilty." As the trial court was sending him back to the jury room, a note arrived that the jury had reached a verdict. Defense counsel objected to the trial court taking the verdict in that situation but the trial court determined to do so.
When the panel returned to the court room, the foreman announced a unanimous verdict; he said the panel found defendant guilty of conspiracy, guilty of second-degree robbery of Deventer, not guilty of carjacking the Town Car but guilty of its theft, not guilty of murder or aggravated manslaughter but guilty of reckless manslaughter, guilty of felony murder, not guilty of the weapons charges, guilty of receiving stolen property, and not guilty of carjacking the Weinbaum car. Upon polling the jury, however, it was immediately apparent that the "problem" juror did not agree. The trial court eventually determined it had no alternative but to declare a mistrial.
The case was tried for a second time in July 1997, this time for seven days. Again, however, the jury was unable to agree upon a verdict and a mistrial was declared. Its declaration, however, was not so fraught with problems as attended the first trial.
Some months after that second mistrial, defendant was tried for a third time. This third trial resulted in the convictions and sentence we noted earlier.
Defendant's first point on appeal is that he could not be retried on those counts for which a verdict of not guilty was announced after the jury told the trial court it had reached a verdict on November 27, 1996. We disagree, for two reasons.
Both the United States Constitution and the New Jersey Constitution protect a defendant against "a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense." State v. Widmaier, 157 N.J. 475, 489-90, 724 A.2d 241 (1999). A jury verdict is not final, however, "until the deliberations are over, the result is announced in open court, and no dissent by a juror is registered." State v. Rodriguez, 254 N.J.Super. 339, 348, 603 A.2d 536 (App.Div.1992) (quoting United States v. Rastelli, 870 F.2d 822, 834 (2d Cir.1989), cert. denied sub nom., Agar v. United States, 493 U.S. 982, 110 S.Ct. 515, 107 L. Ed.2d 516 (1989)). The announcement of a verdict by a foreman does not make it final. State v. Rodriguez, supra, 254 N.J.Super. at 349, 603 A.2d 536. The jury remains a deliberating jury until the trial court accepts the verdict and discharges the panel. State v. Lefkowitz, 335 N.J.Super. 352, 358, 762 A.2d 323 (App.Div.2000). Under the circumstances which developed in defendant's first trial, we are satisfied that the jury never returned a final verdict on November 27, 1996 and that there was no bar to defendant being tried again for these crimes.
Defendant's argument, moreover, overlooks the fact that he proceeded to a second trial on all counts in 1997, with no objection and no mention that jeopardy had in some manner attached. We are satisfied that the State was in no way precluded from retrying this defendant on all counts when the third proceeding commenced in March 1998.

B
Defendant's second argument is that under the principle of fundamental fairness, as enunciated in State v. Abbati, 99 N.J. 418, 493 A.2d 513 (1985), the State should have been precluded from proceeding with a third trial. Again, we disagree.
*869 The defendant in Abbati was charged with kidnapping and aggravated sexual assault. He testified the encounter with the alleged victim was entirely consensual while she testified to the contrary. The matter was tried twice, and each time the jury was unable to reach a verdict. Defendant moved to preclude a third trial; the court granted his motion and dismissed the indictment. The Appellate Division reversed. The Supreme Court reversed the opinion of this court and remanded the matter to the trial court, outlining those factors a court should consider before dismissing an indictment in such a circumstance. These include the number and outcome of prior proceedings; the length, complexity and similarity of evidence in the prior proceedings; the likelihood of any differences in any subsequent proceeding; the trial court's own evaluation of the relative strength of the parties' positions; the professional manner in which the matter has been handled by counsel. Abbati, supra, 99 N.J. at 435, 493 A.2d 513.
This court has not hesitated, in the proper situation, to exercise its inherent authority to hold that a retrial of a defendant would be fundamentally unfair. State v. Simmons, 331 N.J.Super. 512, 752 A.2d 724 (2000). Defendant in that case was convicted in 1977 of murder and robbery. In 1995, the Court of Appeals for the Third Circuit held, based on alleged Gilmore violations in jury selection, that he was entitled to a new trial. Two trials were conducted thereafter, more than twenty years after the slaying, both of which resulted in deadlocked juries. We held that defendant, who had already served twenty years in prison, was entitled to a dismissal of the murder charge.
We cannot consider the instant matter at all similar. We note, for instance, that as we have recounted earlier in this opinion, the jury deliberations attendant to the first trial were marked by developments which, at the very least, can fairly be described as out-of-the-ordinary. The attorney who represented defendant at all three trials had been admitted to practice more than twenty years when the first trial was held and noted several times that he had never experienced anything similar to what occurred on the last day of deliberations. In addition, the State had located additional witnesses it proposed to have testify at the third trial to clarify for the jury the sequence of events on the day in question. We are satisfied the trial court's conclusion that defendant was not entitled to a dismissal of some of these charges on the grounds of fundamental fairness was appropriate.

C
Defendant's third argument is that the trial court erred in admitting into evidence testimony of the out-of-court identifications of defendant that were made by Fisher and Kollick. We note initially that a portion of defendant's argument on this issue is based upon testimony delivered during the course of defendant's third and final trial, rather than upon the testimony proffered at the Wade hearing which was held prior to the commencement of the first trial. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L. Ed.2d 1149 (1967). It was the testimony at that first hearing which was the basis of the trial court's finding there was no unfairness in the procedure and no substantial likelihood of misidentification. Further, defendant made no challenge to this testimony at the third trial which resulted in the convictions on appeal before us. We have reviewed the record and are content to affirm on this question on the basis of the trial court's written opinion of November 6, 1996.

*870 D
During the course of the trial, Cross's roommate Edward Barden testified that he had seen defendant in possession of a small black revolver a few weeks before Deventer's killing. Defendant argues that testimony was admitted in violation of Rule 404(b). We agree with the trial court's conclusion that evidence that defendant had access to such a weapon shortly before July 14, 1995 was relevant to the question of defendant's identity and thus admissible. The trial court gave a careful limiting instruction to the jury, both at the time the evidence was first received and in its final charge; there is no basis for reversal on this issue.

E
Deventer's killing generated a substantial amount of public interest and publicity. Immediately prior to the commencement of defendant's third trial, there were additional newspaper articles. Defendant sought an adjournment of the trial on the basis of that pretrial publicity. The trial court carefully covered the matter during the jury selection and scrupulously interrogated the jury during the course of the trial to ensure that the panel was not tainted by publicity. The trial court did not, contrary to defendant's assertions, abuse its discretion in denying that motion. State v. Mance, 300 N.J.Super. 37, 53, 691 A.2d 1369 (App.Div.1997); State v. King 215 N.J.Super. 504, 515, 522 A.2d 455 (App.Div.1987); State v. Lamb, 125 N.J.Super. 209, 213, 310 A.2d 102 (App.Div.1973).

F
Defendant also maintains that the prosecutor committed reversible error at several points in his summation. Specifically, he contends that the prosecutor improperly commented on defendant's failure to testify and implied that the defense had some burden of proof, improperly denigrated the defense and implied that Fisher, the cemetery worker, testified as he did out of fear. We have carefully reviewed the summation in light of those assertions and find no reversible error. The trial was long, complex and hard-fought on both sides. The prosecutor put forth "a vigorous and forceful presentation of the State's case." State v. Setzer, 268 N.J.Super. 553, 565, 634 A.2d 127 (App.Div.1993), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994). The trial court gave clear and explicit instructions to the jury after the summations, addressing the issues of which defendant now complains. We are satisfied that defendant was not deprived of a fair trial.

G
Defendant seeks to amend the judgment of conviction, which reflects a conviction for aggravated manslaughter. He relies upon the written transcript of the return of the jury's verdict, which reports the foreman advising the court that it found defendant not guilty of aggravated manslaughter. This argument disregards the fact that the verdict sheet clearly marked defendant guilty of aggravated manslaughter and that the trial court, when it polled the jury, indicated a verdict of guilty of aggravated manslaughter and all jurors concurred. Further, when the foreman reported the verdict, he did not proceed to reckless manslaughter from aggravated manslaughter, as he would have done if the jury had indeed found defendant not guilty of aggravated manslaughter. We agree with the conclusion of the trial court, that the written transcript is in error. Finally, the trial court at sentencing merged the conviction for aggravated manslaughter into that for felony murder and dismissed it.

*871 H
Defendant's final argument is that his sentence is manifestly excessive in that the trial court imposed both maximum and consecutive sentences. We do not consider the argument to have sufficient merit to warrant discussion in a written opinion for it would have no precedential value. R. 2:11-3(e)(2).
For all the reasons we have stated, defendant's convictions and sentence are affirmed.