**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5725-17

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CHRISTOPHER M. KOLLER,

     Defendant-Appellant.

_____

Argued October 21, 2020 - Decided February 10, 2022

Before Judges Accurso, Vernoia and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 17-07-0791.

Raymond A. Grimes argued the cause for appellant.

Joie D. Piderit, Assistant Prosecutor, argued the cause for respondent (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Joie D. Piderit, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

The opinion of the court was delivered by

ACCURSO, J.A.D.

A jury convicted defendant Christopher M. Koller of first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); fourth-degree hindering his own apprehension, N.J.S.A. 2C:29-3(b)(1); and third-degree distribution of cocaine, N.J.S.A. 2C:35-5(a)(1) and 5(b)(3), and the judge sentenced him on the murder conviction to sixty years in State prison subject to the periods of parole ineligibility and supervision required by the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, as well as to consecutive terms of eighteen months and five years for hindering and distribution respectively. Those terms were consecutive to a sentence defendant was then serving for violation of parole. Defendant raises the following arguments on appeal:

POINT I

THE PROSECUTOR'S IMPROPER COMMENTS CONSTITUTE PROSECUTORIAL MISCONDUCT AND PLAIN ERROR REQUIRING REVERSAL. (Not Raised Below)

POINT II

THE JURY CHARGE WAS INCORRECTLY GIVEN AS A JURY INSTRUCTION ON PASSION/ PROVOCATION MANSLAUGHTER SHOULD HAVE BEEN GIVEN. (Not Raised Below)

A-5725-17

POINT III

THE DEFENDANT'S FIFTH AMENDMENT RIGHT TO REMAIN SILENT AND HIS RIGHT TO AN ATTORNEY UNDER MIRANDA WAS VIOLATED WHEN THE POLICE IGNORED DEFENDANT'S REQUEST FOR AN ATTORNEY. (Not Raised Below)

POINT IV

THE TRIAL COURT ERRED IN NOT PERMITTING DEFENSE'S CHARACTER WITNESS TO ALSO TESTIFY CONCERNING FACTS OF WHICH SHE WAS AWARE. (Not Raised Below)

POINT V

DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS CONSTITUTIONAL RIGHTS. (Not Raised Below)

POINT VI

THE SENTENCE IMPOSED WAS MANIFESTLY EXCESSIVE. (Not Raised Below)

POINT VII

THE CUMULATIVE EFFECT AND IMPACT OF ALL THE ERRORS DENIED THE DEFENDANT A FAIR TRIAL. (Not Raised Below)

POINT VIII

THE CONVICTION FOR THE DISTRIBUTION OF COCAINE SHOULD BE VACATED AS THE

3

VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE. (Not Raised Below)

In his pro se supplemental brief, defendant argues:

POINT I

THE TRIAL COURT'S FAILURE TO CHARGE THE JURY ON PASSION PROVOCATION MANSLAUGHTER CONSTITUTES PLAIN ERROR WHICH DEPRIVED [DEFENDANT] OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW. (Not Raised Below)

POINT II

THE TRIAL COURT ABUSED ITS DISCRETION AND DEPRIVED [DEFENDANT] OF HIS RIGHT TO A FAIR TRIAL BY FAILING TO VOIR DIRE THE JURY OR DECLARE A MISTRIAL WHEN THE VICTIM'S FAMILY MEMBERS AND FRIENDS WORE PINK CLOTHING DEPICTING EXPRESSIONS THROUGHOUT THE TRIAL PROCEEDINGS. (Raised Below)

POINT III

THE PROSECUTOR'S COMMENTS DURING SUMMATION AND CROSS-EXAMINATION CONSTITUTES PLAIN ERROR. (Not Raised Below)

A. The prosecutor's improper comments suggesting that [defendant] was motivated to kill Bezek because she refused his sexual desires deprived him a fair trial.

4

B.  The prosecutor's calculated statements regarding [defendant's] prior conviction and current imprisonment deprived him a fair trial.

POINT IV

THE CUMULATIVE IMPACT OF THE ERRORS DENIED [DEFENDANT] A FAIR TRIAL.  (Not Raised Below)

Having considered these arguments in light of the record and applicable legal standards, we affirm defendant's convictions but remand for resentencing in accordance with State v. Torres, 246 N.J. 246 (2021).

We analyze the issues defendant raises on appeal in the context of the facts the jury heard and the arguments the State and defendant presented at trial.  We summarize them here.

Shortly after midnight on November 1, 2019, the victim, Beth Bezek, a five-foot-two, thirty-one-year-old woman weighing one hundred and seventeen pounds, fell to her death from the bedroom window of defendant's third-floor apartment in Piscataway.  Defendant claimed he and Bezek had known one another for about two months and had a casual, intimate relationship, centered on their regular use of cocaine.  Defendant had formerly been selling real estate, but his license had been suspended for several years following a theft by deception conviction.  He was, at the time of these events, working for his

5

brother-in-law and supplementing his income by selling cocaine. Bezek had recently quit her job tending bar at the Moose Lodge in Raritan. According to defendant, he would occasionally supply her cocaine for sale to bar patrons.

On the day she died, Bezek and defendant texted from early morning, throughout the day and into the evening. Bezek started the exchange at 5:31 a.m. In addition to saying she wanted "to hang," she also said she wanted to pick up her Ipad to photograph her niece and nephew at a midday Halloween parade. Defendant texted an hour later suggesting she stop over to get it after work. At midday, Bezek texted "Hey, mister, you around for an 80? Have exact cash." Defendant again texted he was working and suggested she come by later. At 8:47 p.m. defendant sent Bezek a text stating: "I had a tough day. Do you want to hang and party a little? I need a friend. No trades necessary. I just want some company and laughs." Bezek, who was then having dinner with her boyfriend at his apartment, responded that she would be there "like ten or eleven," and again mentioned retrieving her iPad. Bezek's boyfriend testified she left his apartment about 10:30 p.m. While he suspected she was using cocaine again because she had been "sniffling heavy, like she had allergies or something," he claimed "[s]he seemed normal," and not at all impaired.

A-5725-17

Defendant and Bezek continued to text and exchange emojis until 10:59 p.m. when Bezek texted "Still want me by?" and defendant responded with an enthusiastic "yes." Bezek asked if defendant had "80" "for a friend" with defendant responding "Yeah, sure." Twenty minutes later, Bezek texted that her "friend," an "old drunk from [her] bar," was with her, and asked whether defendant wanted him "to wait down the road?" Defendant responded, "Don't bring anyone here." Bezek dropped her passenger at a nearby bar to await her return with his cocaine. Bezek and defendant continued to text, with Bezek texting she was "Here" at 12:02 a.m. At 12:15 a.m. she texted that she was in the lobby. In the last text exchanged between the two, defendant immediately responded that he was "Coming now."

According to defendant, he could tell in the elevator up to his apartment that Bezek was "extremely high" on cocaine; her eyes were darting everywhere and her nose was "leaking." When they entered his apartment, she declined his offer of an iced tea and went into the bathroom. When she emerged, she had eighty dollars in her hand and asked where the cocaine was. Defendant testified he told her he didn't have any, because she "stole it all" several days previous, and he would have to go get some. Bezek said she needed a cigarette

7

and the two went into the living room and sat on the couch. Bezek denied she stole defendant's cocaine and wanted to know where her iPad was. According to defendant, when he told her it was downstairs in his work truck, Bezek got very angry and attacked him, screaming and hitting him repeatedly. He claimed she was acting "crazy," and that he'd never seen her like that.

Defendant, who is six foot, three inches tall and weighs two hundred and thirty pounds, testified he grabbed both of Bezek's arms and tried to pull her back down to the couch. He claimed she kept screaming "Help, help, stop" as she was hitting him. Concerned that she would wake his neighbors, he told her to "Shut up," and then used his hand to cover her mouth to stop her screaming. When he realized his hand was covered with blood from her nose, he wiped his hand on his shirt "just as an instinct." When Bezek bit him on the arm, the two went to the floor. Defendant "grossed out" out by the blood and mucous coming from Bezek's nose, grabbed a throw pillow to put over her mouth to quiet her. After he told her she was not going to overpower him and he had no intention of beating her up, she calmed down and the two stood up.

He told her to go into the bathroom to clean herself up, but she walked into the bedroom, sat on his bed and pulled out her phone, screaming "We got to get Mike." Defendant testified as he turned to go into the bathroom to wash

8

up, Bezek jumped on his back, attacking him again and hit him over the head with a lamp. He claimed they again went to the floor and he "had to sit on top of her again" like he had in the living room. Defendant testified he tried to grab her hands while she was "swinging wildly and kicking." She finally stopped when he grabbed her neck and squeezed for two or three seconds. He denied putting Bezek in a chokehold.

Defendant claimed that once she calmed down, he helped her to sit on the bed and said "Look, you're out of your freakin' mind right now. I'm gonna get you some water. Just chill the fuck out." Defendant testified that as he walked to the kitchen, Bezek said, "It's hot in here," and he responded, "Cause you're actin' like a frickin' maniac." According to defendant, Bezek then rolled across the bed and opened the window. Out of the corner of his eye, he saw Bezek open both the window and the screen. He turned and asked "What — what is — what are you doing? And she — she's dipping her head out and she's climbing out to — I was like, We're on the third floor. Where you going? And then she — she was airborne. She just jumped."

Defendant looked out the window and saw her laying in the parking lot. He ran downstairs and stood over her, but she wasn't moving. According to defendant, he ran upstairs to get his phone to call 911, but then panicked.

A-5725-17

Defendant took Bezek's cell phone and keys, got into his car and started to drive. He tried to call a friend several times and then drove to New Brunswick, looking for a pay phone to call 911. He told the operator where Bezek was, but did not give his name. He tossed her belongings and returned to his apartment complex to find several police cars. Defendant, testifying he was trying to "blend in," let an officer into the lobby and asked what was going on. The officer replied that a woman had been seriously hurt. Defendant continued to his apartment, not revealing his involvement.

When that officer and another knocked on his door a few minutes later, having noticed a broken screen three flights above Bezek's body, defendant initially told them he had been in Manville at a friend's place for the evening, the friend he called on his way to New Brunswick. When they noticed the blood on his shirt, defendant told them "the girl" had been in his apartment, that she'd been "coked up" and irrational, that they'd had a fight, and she jumped out the window. He was arrested and taken to the police station. Although he was not interrogated because his lawyer advised him not to speak, defendant made several voluntary statements, including that Bezek had bitten him, that she was "freaking out," that he hoped she was alright, and that they should test her for drugs because she was very high.

10

The only signs of a struggle police found in defendant's apartment were in his bedroom, where they also found a condom on the bedside table. There was a scale and white residue on the kitchen counter, and defendant had eighty dollars in his pocket at the time of his arrest. In Bezek's car, police found her purse, containing her wallet and a small bag containing over two grams of cocaine. Her keys, cellphone and iPad were never recovered.

Defendant's upstairs neighbor testified he was awakened shortly after midnight by an argument between a man and a woman in the apartment below his that lasted for fifteen or twenty minutes. He said the woman sounded in distress and he heard her say "stop" four times. By the time he got up to call police, the screaming stopped, and he went back to bed without reporting it.

Bezek's "friend" testified he had given her eighty dollars for a drug purchase, and that he went with her to pick up the drugs because she had "burned" him before. He claimed she had no problem driving and seemed fine when she dropped him off to wait at the bar, but that she never came back for him. He called her ten times, reaching her once. Bezek sounded as if she was speaking to someone else and mumbled something like, "you have to go back and pick up Mikey" before the phone went dead. Worried that Bezek was in trouble, he called her boyfriend, and eventually took a cab home. Bezek sent a

11

virtually blank text to her boyfriend at 12:30 a.m. Her last outgoing call was at 12:34 to the man she left at the bar.

Buttressed by the testimony of the medical examiner of injuries Bezek suffered prior to her fall, including deep compression injuries to her neck, petechial hemorrhages to her left eye and bruising on the bridge of her nose and inside her lip, the State's theory at trial was that defendant choked the victim into unconsciousness and threw her out of his bedroom window when she refused to have sex with him. The prosecutor began her opening by reading from a "letter to the universe" defendant had written in the weeks before Bezek's death asking for "a tall blonde girl with an amazing body" he could marry and have children with, as well as a trip to San Jose, "$50,000 within 60 days," and, in a post script, "Before the wife, send me a couple of little flings." The prosecutor claimed defendant tried to make Bezek "one of those little flings," and when she wouldn't cooperate, he killed her by throwing her out the window.

Defendant contended the State's theory was nonsense, arguing the condition of Bezek's clothes didn't support the State's claim of attempted rape, and that he had no reason to either force himself on Bezek or to kill her. He pointed to the many text messages he and Bezek had exchanged as proof of

12

their easy, intimate relationship and called a former girlfriend, who testified he was a kind and caring man and had never been aggressive or violent with her.

Defendant claimed the detectives never tried to investigate the facts or figure out what happened after defendant initially lied to them about where he'd been that night. Buttressed by the testimony of his own expert, a doctor who testified regularly on behalf of the prosecutor's office, who claimed Bezek was "acutely intoxicated" with some of the highest levels of cocaine he'd ever seen short of those in individuals dying of overdose, defendant's counsel argued police simply didn't believe defendant when he told them how high she was, and that she had just gone crazy and jumped out the window.

Defendant's expert, however, testified a person at Bezek's level of intoxication would potentially believe she could perform extraordinary physical feats, as more commonly evidenced by "people on the street" who "become aggressive and believe they can take on, you know, two or three police officers" when that is obviously not the case. Based on the State's toxicology report, defendant's expert thought it likely Bezek would have ingested the cocaine within an hour or two of her death, and he testified an elevated temperature and sweating, as well as a racing heartbeat and "a feeling

13

of terror" would be common symptoms associated with the amount of cocaine in her system.

Defense counsel theorized that Bezek had snorted cocaine in her car after she left her "friend" at the bar — likely in the parking lot of defendant's apartment during the thirteen minutes between the time she texted defendant that she had arrived and when she texted him that she was in the lobby. Counsel argued to the jury that defendant told police in "a voluntary statement" at the time of his arrest that they had better test Bezek for cocaine and that she was "all freaked out, but they didn't believe him" because "[t]he story seemed too fantastic." Thus, counsel claimed, detectives never even bothered to dust the window and the screen for Bezek's fingerprints; "but lo and behold, ten days later, when the toxicology test comes back, she's high on coke, and not just high, she's whacked out, super high on cocaine" and there's no DNA on the window screen. Counsel argued that "[h]ad the police simply listened," they would have come to the only conclusion supported by "the physical and forensic evidence" that "Bezek freaked out and jumped out the window."

Before we address defendant's arguments on appeal, we note that with the exception of his complaint about the clothing worn by the victim's friends

14

and family at trial, none of these arguments were raised to the trial court.  We review arguments raised for the first time on appeal under a plain error standard, meaning we disregard such errors unless "clearly capable of producing an unjust result."  R. 2:10-2; State v. Daniels, 182 N.J. 80, 95 (2004); State v. Macon, 57 N.J. 325, 337 (1971).  One of the reasons we deal with claims of error that could have been, but were not, raised at trial differently from those timely challenged is because "[i]t may be fair to infer from the failure to object below that in the context of the trial the error was actually of no moment."  Macon, 57 N.J. at 333.  Accordingly, we will reverse a defendant's conviction only if convinced the error is "sufficient to raise a reasonable doubt as to whether" it "led the jury to a result it otherwise might not have reached."  Id. at 336.

Defendant's first argument is that the prosecutor's summation was inflammatory and "impermissibly commented" on his pre- and post-arrest silence.  He specifically objects to the prosecutor telling the jury that this was the first time the State had heard the story defendant told at trial, and that his testimony was "longer than the incidents leading to [Bezek] jumping out of the window."  Defendant claims those comments, that guilty people "conceal items and twist things to fit their version of the facts," and that he had "the most to

15

lose so he was obviously lying," "strongly suggest[ed]" he had an affirmative obligation to establish his innocence rather than the right to remain silent.

Defendant adds two challenges to the prosecutor's summation in his pro se brief. He claims the State's comments suggesting he killed Bezek because she refused his sexual advances exceeded the scope of the evidence, and its "calculated statements" about his criminal record were improper because the jury should not have been told he "was serving time in State Prison as a result of lying."

"[T]he primary duty of a prosecutor is not to obtain convictions but to see that justice is done." State v. Smith, 212 N.J. 365, 402-03 (2012). Prosecutors, of course, are "expected to make vigorous and forceful closing arguments to juries," State v. Frost, 158 N.J. 76, 82 (1999), and they are "not required to present those arguments as if [they] were addressing a lecture hall," Smith, 212 N.J. at 403. Nevertheless, they must confine their remarks to comment on the evidence and the reasonable inferences that can be drawn from it and must not make "inaccurate factual assertions to the jury," or otherwise employ underhanded means to secure a conviction. State v. Garcia, 245 N.J. 412, 435 (2021). A reviewing court, limited as it is to the cold record, "may infer from counsel's failure to object to the remarks at the time

16

they were made that [counsel] did not in the atmosphere of the trial think them out of bounds." State v. Johnson, 31 N.J. 489, 511 (1960). We review any claimed excess in the context of the whole trial and will reverse "only if 'the conduct was so egregious as to deprive defendant of a fair trial.'" State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)).

Employing those standards here, we detect no reversible error. First, it's important to remember that defendant, and not the State, introduced the "voluntary statements" he made at the time of his arrest. Indeed, the entire theory of his defense was built on those statements — that the police rejected his claim that Bezek jumped to her death because the story was too implausible, and thus they failed to properly investigate her death, omitting basic steps, such as dusting the window and screen for fingerprints, that could have exonerated him. As our Supreme Court has explained, "[i]f a defendant elects to speak to the police and offers an account of what happened, then he has not remained silent—he has spoken." State v. Kucinski, 227 N.J. 603, 624 (2017).

Under those circumstances, a prosecutor's comment about what a defendant left out of his statement as compared to his trial testimony is not a

17

comment on the defendant's silence, but on his prior inconsistent statement. Id. at 623-24 (noting "[a] defendant cannot have it both ways. If he talks, what he says or omits is to be judged on its merits or[ ] demerits, and not on some artificial standard that only the part that helps him can be later referred to" (quoting United States v. Fambro, 526 F.3d 836, 842 (5th Cir. 2008))). "[I]t is not an infringement of a defendant's right to remain silent for the State to point out differences in the defendant's testimony at trial and his or her statements that were freely given." State v. Tucker, 190 N.J. 183, 189 (2007). Accordingly, we cannot find the prosecutor impermissibly commented on defendant's pre- and post-arrest silence by noting he had never previously provided the State with the information he provided the jury or comparing his previously unchallenged statements at the time of his arrest with the lengthy account of his actions he offered at trial.

As for the prosecutor shifting the burden of proof to defendant, we consider the prosecutor's comments in the context of defense counsel's summation. See Smith, 212 N.J. at 404 (explaining that in reviewing the trial record to determine whether a prosecutor's comments in summation exceeded what was permissible, "an appellate court will consider whether the offending remarks were prompted by comments in the summation of defense counsel").

Defendant's counsel argued to the jury that defendant's act of closing the window, driving to a pay phone and getting rid of Bezek's cellphone after she jumped out of the window was "the first normal human reaction anyone would have" if they had a theft by deception conviction, was "flunking out of probation, . . . doing coke . . . selling coke," she's "doing coke," he's "fronting her the coke," and she's "selling it. This is not what he's supposed to be doing on probation." Counsel acknowledged that when defendant returned to his apartment, "yes, it's true, as he walked to the front door during those two seconds he didn't tell the police, oh, by the way, I'm the guy who called before," but counsel insisted defendant "knows the police are going to come" and when they do, he tells them "within 30 seconds" that Bezek was there, they'd had an argument, that she attacked him and jumped out the window.

The prosecutor's comments to which defendant now objects and contends shifted the burden to him, that "[g]uilty people conceal items and twist things to fit their version of the facts," that "the first time the vast majority of any of this story from [defendant] comes out is here in court," and that "it's hard to keep your story straight when your story is made up," were in direct response to his counsel's summation. We quote the prosecutor's remarks in context.

19

Addressing defendant's "voluntary statements" made while investigators were collecting evidence and taking DNA samples, the prosecutor explained that officers were not allowed to ask any follow up questions and therefore

> the first time the vast majority of any of this story from Mr. Koller comes out is here in court. The first time anyone has had a chance to challenge him on any of his story is here before you folks.

Addressing defendant's explanation of why he panicked and fled, the prosecutor said:

> Innocent people try to help their friends in a time of need. Right? Innocent people, when someone who they care about . . . just went out the window, would try and help that person. People with nothing to hide tell the truth. If you've got nothing to hide, just tell the truth. But what do guilty people do? They run. They run from the scene, and they hide evidence. Guilty people panic, and they don't call 9-1-1, they call their drug dealing friend . . . eight times to try to get an alibi. . . . Guilty people conceal items and twist things to fit their version of the facts. Conceal things to fit their version of the facts. Conceal things like a phone, like an iPad, like car keys, like cocaine.
>
> But it's hard to keep your story straight when your story is made up, when you're trying to cover up for your actions and you need to twist the facts to fit, because then your explanation of things may not make sense. When your story is not supported by the evidence and your story is a lie, then you run the risk that it just doesn't fit, that it just doesn't make any sense.

20

A-5725-17

Again addressing defendant's explanation for why he left his apartment, the

prosecutor argued:

> Why did he leave the apartment immediately after
> [Bezek] went out the window?  Oh.  Because he's on
> probation and he's a drug dealer and he panicked and
> he ran?  Well, if he didn't do anything wrong, flush the
> coke and call 9-1-1.  Why did he clear [Bezek's]
> belongings out of the house?  Because in the instant he
> wanted to try and get any sign of her possible out of
> his residence to try and get out from under it.  Why
> did he not call 9-1-1 from any of his four cell phones
> that he had?

And addressing defendant's actions when he returned to his apartment after

anonymously calling 911, the prosecutor argued:

> Why didn't he say anything to Officer Paiano when he
> let him in the building?  Officer Paiano is there.  Do
> you remember?  He's trying to get in the building.
> Their pass code doesn't work, and some guy comes
> walking up with a hoodie, and does he say, Officer,
> thank God you're here, you're not going to believe it,
> this girl jumped out my window.  Thank God, you've
> got to help me.  I don't know what else to do.  No.  He
> skulks by into his apartment and doesn't say a word.
> Does that sound like the actions of a person who is not
> responsible for this girl's death?

Although the prosecutor's closing was undeniably forceful and some of

his remarks may have bordered on the objectionable, no objection was made,

leading us to conclude, as defense counsel likely did, that the comments were

not "out of bounds."  See Johnson, 31 N.J. at 511.  We also find no error in the

21

prosecutor's reference to defendant's prior conviction, which was properly admitted after he elected to testify, see N.J.R.E. 609(a)(1); State v. Sinclair, 57 N.J. 56, 64-65 (1970), or in his arguing defendant killed Bezek when she refused his advances, given the evidence of a struggle was confined to defendant's bedroom and the condom police found on the bedside table. And, of course, a prosecutor is certainly free to comment on a defendant's credibility. See State v. Darrian, 255 N.J. Super. 435, 458 (App. Div. 1992). Having reviewed the entire record, we are satisfied the prosecutor's remarks did not stray beyond fair commentary on the evidence and the reasonable inferences that could be drawn from that evidence. See State v. Smith, 167 N.J. 158, 178 (2001).

Further, our conclusion that the prosecutor's remarks did not improperly shift the burden of proof to defendant is fortified by the court's clear and direct instruction to the jury following summations that "[t]he burden of proving each element of the charge beyond a reasonable doubt rests upon the State and that burden never shifts to the defendant." Those instructions were "sufficient to remove any implication 'that the defense had some burden of proof.'" State v. Patterson, 435 N.J. Super. 498, 513 (quoting State v. Jenkins, 349 N.J. Super. 464, 479 (App. Div. 2002)). In no event could we find that anything in the

22

prosecutor's closing remarks was so egregious as to deprive defendant of a fair trial. See McNeil-Thomas, 238 N.J. at 275.

Defendant's remaining arguments require only brief comment. We agree with defendant that there was certainly a basis in the evidence for a passion/provocation charge. See State v. Funderburg, 225 N.J. 66, 80-82 (2016). And the judge made clear during the charge conference he would have given it, but for defense counsel's insistence it was "not [his] theory, it's not the State's theory," and that there was "no theory upon which there would be sufficient passion provocation."

Defense counsel took pains to make the record clear that he "vehemently object[ed] to any reference to passion provocation in the charge," stating he had "made [his] argument" and could not state "in any more strenuous terms" that he "absolutely [did] — adamantly [did] not want that charge in there." After the judge laid out the evidence to support the passion/provocation charge, defense counsel responded that he understood the court's logic in suggesting the charge, noting "I've made it as clear as I possibly can . . . I do not want the charge." The judge was not required to give the charge over counsel's adamant objection that it was incompatible with his defense, see State v. Daniels, 224 N.J. 168, 184 (2016), and to the extent there was error in

23

failing to give the charge, it was plainly invited, thus precluding any relief here, see Jenkins, 178 N.J. at 358 (noting "a 'defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial'" (quoting State v. Pontery, 19 N.J. 457, 471 (1955))).

Defendant's claim that police violated his Fifth Amendment rights by denying his request for counsel is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). First, defendant stipulated at trial that all of his statements were given voluntarily. Second, the statements defendant complains about, the ones he made about the victim being high on cocaine and jumping from the window while police were collecting evidence and DNA samples, were introduced by his counsel on cross-examination of the State's witnesses, over the State's objection. Finally, we found no evidence to support his assertion that his attorney was at the police station "for hours" before being allowed to see defendant, and the references in counsel's brief alleging it are without citation to the record.

We reject defendant's claim the court erred in not permitting his ex-girlfriend to testify about his "letter to the universe" with which the State

opened its case. He contends she would have testified as to "why it was written and that it was written to her." The judge disallowed that testimony because defendant had listed his ex-girlfriend as a character witness and never advised the State she would be offering substantive evidence. See State v. Tier, 228 N.J. 555, 565 (2017) (approving a trial court order requiring a defendant to identify a witness as a fact or character witness under Rule 3:13-3(b)(2)(c)). As the witness was permitted to testify to defendant's character as a gentleman and a non-violent person, see N.J.R.E. 404(a)(1), and she would not have been able to offer any probative evidence as to what defendant intended by the words he wrote, as that information was known only to him, we find no abuse of discretion, see State v. Scharf, 225 N.J. 547, 572 (2016), and no prejudice, State v. Burton, 309 N.J. Super. 280, 289 (App. Div. 1998).

We decline to consider defendant's several claims of ineffective assistance of trial counsel on this appeal, as they are "predicated on 'allegations and evidence that lie outside the trial record,'" State v. Petrozelli, 351 N.J. Super 14, 22 (App. Div. 2002) (quoting State v. Russo, 333 N.J. Super. 119, 138 (App. Div. 2000)), and are thus better suited for post-conviction relief, see State v. Preciose, 129 N.J. 451, 460-62 (1992).

Defendant's claim that his conviction for distribution of cocaine should be vacated because the verdict was against the weight of the evidence "is not cognizable on appeal since no motion for a new trial on that ground was made in the trial court." State v. Perry, 128 N.J. Super. 188, 190 (App. Div. 1973) (citing R. 2:10-1). Even were the claim cognizable, we would reject it as the text messages made clear Bezek went to defendant's apartment to purchase cocaine, defendant was found in possession of the eighty dollar purchase price, police recovered a scale in his kitchen, and defendant testified he supplemented his income by selling drugs, and that he had given and sold drugs to Bezek before. As the court found in denying his motion to dismiss the charge, there was sufficient evidence in the record to support a finding he was guilty of distribution. See State v. Jester, 68 N.J. 87, 90-91 (1975) (noting distribution of narcotics can be proved by circumstantial evidence).

We reject defendant's claim he was denied a fair trial based on the judge's failure to voir dire the jury or declare a mistrial based on several spectators wearing pink clothing or ribbons as expressions of sympathy for the victim. As the State notes, N.J.S.A. 52:4B-36.1(b) permits a victim's family or other spectators to wear a button, no larger than four inches in diameter, with the victim's picture during any judicial proceeding, so long as the judge is

satisfied it will not deprive defendant of his right to a fair trial. Although no request was made by defense counsel to voir dire the jury, he raised the issue to the judge, who addressed the matter on the record, making clear findings that the display was not so obtrusive so as to influence the jury. Defendant has provided us nothing that would permit us to conclude the judge abused his discretion in that regard. See State v. R.D., 169 N.J. 551, 559-60 (2001) (noting trial courts have traditionally been accorded deference with regard to matters pertaining to the jury in respect of that court's unique perspective).

Having reviewed the entire record, we are satisfied defendant's trial was free of any appreciable error, whether considered singly or in combination. Accordingly, we reject his claim that cumulative error entitles him to a new trial on all charges. See Wakefield, 190 N.J. 538.

We turn now to defendant's sentence. Although defendant has styled his objection to his sentence as simply "manifestly excessive," a review of his argument makes clear he is contending the judge's failure to "provide reasons for imposing three consecutive sentences" is violative of Yarbough,[1] and thus requires a remand for a new sentencing hearing. We agree.

---

[1] State v. Yarbough, 100 N.J. 627 (1985).

Although it is axiomatic that our review of a trial judge's sentencing determination is deferential, State v. Fuentes, 217 N.J. 57, 70 (2014), and "review of the length of a sentence" limited, State v. Miller, 205 N.J. 109, 127 (2011), we nevertheless are charged with ensuring the trial court's findings and balancing of the aggravating and mitigating factors are supported by adequate evidence in the record, and that the sentence imposed is neither inconsistent with the sentencing provisions of the Code of Criminal Justice nor shocking to the judicial conscience. See Fuentes, 217 N.J. at 70-71. Only "[i]f a sentencing court observes the procedural protections imposed as part of the sentencing process" will its exercise of sentencing discretion to impose consecutive sentences be sustained. State v. Cassady, 198 N.J. 165, 183-84 (2009). Accordingly, any assurance that a sentencing court's decision to impose consecutive sentences will not be disturbed on appeal is conditioned on the judge's proper evaluation of the Yarbough factors in light of the record. Id. at 182.

The court's comments in imposing sentence here were brief. The judge found defendant was forty-one years old and had two prior convictions, a simple assault from 1995, for which he was sentenced to one year's probation, and the theft by deception for which he was then serving a three-year State

prison sentence following two violations of probation. The judge found two aggravating factors — N.J.S.A. 2C:44-1(a)(3) (risk of committing another offense), and (9) (need to deter) — but declined to find aggravating factor six, N.J.S.A. 2C:44-1(a)(6) (prior criminal record). The judge found no mitigating factors.

The court concluded the aggravating factors outweighed the non-existing mitigating factors but provided no reasons for his decision to impose consecutive sentences on these three offenses, a sixty-year NERA term for murder, followed by an eighteen-month term for hindering and a five-year term for distribution, or to run those sentences consecutive to the one defendant was then serving. The judge also failed to engage in any analysis of the real-time consequences of defendant's sentence. See State v. Hernandez, 208 N.J. 24, 50 (2011) (noting "sentencing and appellate courts must 'be mindful of the real-time consequences of NERA and the role that it customarily plays in the fashioning of an appropriate sentence'" (quoting State v. Marinez, 370 N.J. Super. 49, 58 (App. Div. 2004))). Those omissions require we vacate defendant's sentence and remand for resentencing.

After the court imposed sentence in this matter, our Supreme Court revisited Yarbough, reiterating that a "sentencing court's explanation of its

evaluation of the fairness of the overall sentence is 'a necessary feature in any Yarbough analysis.'" Torres, 246 N.J. at 270 (quoting State v. Cuff, 239 N.J. 321, 352 (2019)). In addition to engaging in a qualitative analysis of the Yarbough factors, Torres instructs trial judges to provide "[a]n explicit statement, explaining the overall fairness of a sentence imposed on a defendant for multiple offenses in a single proceeding or in multiple sentencing proceedings." Id. at 268. The Court held "an explanation for the overall fairness of a sentence by the sentencing court is required in this setting, as in other discretionary sentencing settings, to 'foster[] consistency in . . . sentencing in that arbitrary or irrational sentencing can be curtailed and, if necessary, corrected through appellate review.'" Id. at 272 (quoting State v. Pierce, 188 N.J. 155, 166-67, (2006)). Accordingly, the remand shall be conducted in accordance with Torres as well as with State v. Randolph, 210 N.J. 330, 351-52 (2012) (noting remand for reconsideration and justification of sentence requires new analysis of aggravating and mitigating factors).

We affirm defendant's convictions but vacate his sentence and remand for resentencing. We do not retain jurisdiction.

Affirmed in part; vacated in part and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5725-17