**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0791-19

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

D.H.P.-D.,[1]

 Defendant-Appellant.

_____

Submitted May 9, 2022 – Decided July 22, 2022

Before Judges Accurso, Rose and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 18-12-1557.

Joseph E. Krakora, Public Defender, attorney for appellant (Melanie K. Dellplain, Assistant Deputy Public Defender, of counsel and on the brief).

Lori Linskey, Acting Monmouth County Prosecutor, attorney for respondent (Lisa Sarnoff Gochman,

---

[1] We refer to the victim, defendant and certain witnesses by initials or pseudonyms to protect the identity of the victim. R. 1:38-3(c)(9).

Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant D.H.P.-D. was convicted of second-degree sexual assault, N.J.S.A. 2C:14-2(b), and third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1), and after the court ordered the appropriate merger, it sentenced defendant to a six-year prison term on the sexual assault charge, subject to the No Early Release Act, N.J.S.A. 2C:43-7.2, a special sentence of parole supervision for life, N.J.S.A. 2C:43-6.4, and restrictions under Megan's Law, N.J.S.A. 2C:7-1 to -23. We affirm defendant's convictions and sentence.

## I.

In September 2018, defendant's seven-year-old niece, N.P. (Nina) attended her cousin's birthday party at the home of her aunt, J.H. (Jane), and defendant. Nina did not want to leave the party when her mother, N.H. (Nadia), was ready to depart, so Nina was permitted to sleep at Jane's house overnight. Later that night, Nina told Jane that defendant had touched her "parts," pointing to the area of her groin.

Nina explained the incident happened in the summer of 2018 when she was at Jane's home. According to Nina, she was watching a movie with her

cousin in Jane's living room when defendant began touching her "parts," but he stopped as Jane descended the stairs to the living room. Jane asked Nina how many times defendant engaged in this behavior and Nina answered "two, three, twenty."

That night, Jane spoke to her older sister and mother − both of whom lived with her − about Nina's revelations. The next day, Jane informed Nina's parents about the child's disclosures. Once the child's parents retrieved Nina from Jane's home, she repeated to them what she told Jane.

Nadia promptly notified the police about Nina's disclosure. Nadia was referred to the Monmouth County Child Advocacy Center, where Nina was interviewed by Detective Thomas Manzo, Jr. of the Monmouth County Prosecutor's Office. The interview was recorded and played for the jury during the trial.

During the forensic interview, Nina related to Detective Manzo that defendant "touched [her] in [her] private part" "in the summer" by "just put[ting] his hand insider [her]." Consistent with what she explained to Jane and Nadia, Nina informed the detective she was watching a children's movie with her cousin in Jane's home when the assault occurred. She stated defendant was initially lying behind her on a gray couch and attempted to reach out and touch her. He

then "went on the ground" and pulled Nina's underwear down so it was "like [she was] naked." Nina told the detective that defendant "put [her] underwear down so he [could] touch [her] real private part."

When the detective asked whether defendant's "hand or fingers . . . [went] inside [her] private part," Nina responded, "he was just touching it." She also stated defendant's hand continued to touch her "private part" until Jane and Nina's grandmother came downstairs to the living room. Additionally, Nina informed the detective her cousin did not see what happened because he was watching the movie.

Detective Manzo offered Nina anatomically correct dolls to help her describe what occurred and asked her to circle on drawings of body parts where defendant touched her. Using the dolls, Nina indicated how defendant touched her vagina with his hand. When Detective Manzo asked Nina how it "fel[t] when [defendant] was touching [her] private part," she responded, "It felt like . . . it was weird." Detective Manzo asked, "[w]as it just one time he put his hand on your private part or did this happen a bunch of different times," to which Nina answered, "I think only one time."

Nina subsequently attended weekly therapy sessions for a brief period. During these sessions, she told her therapist defendant touched her "private part"

five times, but when she testified before the jury, she again stated defendant touched her vaginal area only once during the summer of 2018.

## II.

Defendant was indicted in December 2018 on charges of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), second-degree sexual assault and third-degree endangering the welfare of a child. Thereafter, Judge Richard W. English conducted a hearing under N.J.R.E. 104(a) to determine the admissibility of Nina's out-of-court statements to Detective Manzo and Jane. Following his review of the video of Nina's forensic interview and the testimony of Detective Manzo and Jane, the judge issued an oral decision, finding Nina's out-of-court statements to these individuals were admissible under the tender years exception to the hearsay rule, N.J.R.E. 803(c)(27).[2]

---

[2] N.J.R.E. 803(c)(27) provides, in part:

> A statement by a child under the age of [twelve] relating to sexual misconduct committed . . . against that child is admissible in a criminal . . . case if (a) the proponent of the statement makes known to the adverse party an intention to offer the statement and the particulars of the statement at such time as to provide the adverse party with a fair opportunity to prepare to meet it; (b) the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement there is a

Judge English reasoned there would be no "confrontation clause issues" because Nina would be testifying at trial. Turning to the forensic interview, the judge noted Detective Manzo was "well-trained in this field. He asked the questions the way you're supposed to. They were not leading. They were open-ended." Acknowledging there were "some potential inconsistencies about the number of times that the [sexual assault] allegedly was to have occurred and where," the judge found these issues went more to "credibility," and it was not his role "to determine [the] credibility of the seven-year-old," who "testifies eventually." Judge English also stressed defense counsel would have ample opportunity to cross-examine Nina about the number of times defendant allegedly assaulted her.

Additionally, in addressing the trustworthiness of Nina's out-of-court statements, Judge English found "one of the things that . . . would lend some truthfulness" to these statements was Nina's comment to Detective Manzo that defendant touching her "felt weird, which sounds like something that a seven-year-old would say, . . . confronted with that situation." Further, the judge noted

---

probability that the statement is trustworthy; and (c) either (i) the child testifies at the proceeding, or (ii) the child is unavailable as a witness and there is offered admissible evidence corroborating the act of sexual abuse.

6

Nina used anatomical drawings and dolls during the forensic interview to indicate "where the defendant allegedly put his hand down her pants and . . . under her underwear." The judge also found Nina's statements did not sound "coerced or rehearsed" and there was "an air of truthfulness under the totality of the circumstances that surround[ed] the statement" Nina made to her aunt during a "closed-door discussion."

During additional pretrial hearings, defendant requested two sentences from a 2016 Division of Child Protection and Permanency (Division) report be admitted into evidence. One sentence referred to Nina having a "history with Mobile Response services" and the other confirmed "[i]n August 2016, the child was assessed for angry outbursts." Defendant argued in favor of their admission "to establish that because [Nina] had a history of outbursts, it followed . . . she made up . . . allegations against [him] for attention or out of anger."

The State objected to admitting this information, contending Nina's assessment in 2016 was "too remote in time, not clearly tied to this case . . . and essentially equate[d] to prior bad acts of the victim." Judge English initially rejected the State's argument, finding this evidence was "fair ground." But after the State moved for reconsideration, the judge found he could not "see a nexus between something that was reported in two lines two years ago and an

7

allegation of sexual assault in 2018." The judge stated, "I don't find that it really falls under . . . [N.J.R.E.] 404(a)(2)[3] or the case law, and so I'm not going to permit any reference to . . . those two lines."

Immediately before the trial commenced, the State moved to exclude an excerpt from a mental health report which revealed that some six months prior to the assault, Nina inadvertently watched a YouTube video of a couple having sexual intercourse. The State argued the report was "not on point, somewhat inflammatory, and dissimilar to the conduct" at issue in the trial because "[t]here's no allegations of intercourse in this case. This [case involves] digital penetration and digital contact on [Nina's] vaginal and buttocks area."

Defense counsel initially disagreed, stating, "one of the questions that might come up is how would a little girl of [seven] years old know about this kind of behavior?" But he conceded he might "be able to get this type of information from her when I cross-examine her" or "from the parents if they

_____

[3] N.J.R.E. 404(a)(2) states, in relevant part: "Evidence of a person's character or character trait . . . is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion except: . . . . Evidence of a pertinent trait of character of the victim of the crime offered by an accused." A defendant may only present character evidence of the victim in the form of opinion, N.J.R.E. 404(a)(2), reputation, N.J.R.E. 405(a), or a prior criminal conviction, N.J.R.E. 609. See State v. Jenewicz, 193 N.J. 440, 459 (2008); State v. Guenther, 181 N.J. 129, 139-41 (2004).

A-0791-19

testify." He added that because Nina "has used the internet, and has learned from the internet,"

> [t]he only reason I would get into [what's] . . . memorialized in this document would be if for whatever reason these other witnesses denied it occurred. Then I'd ask it come in as a prior inconsistent statement.
>
> So directly speaking, I tend to agree with [the State] in that . . . I wouldn't be offering [this evidence] directly, but . . . in case we have a surprise or there's a denial of something that actually did occur.

The judge confirmed with defense counsel, "[s]o . . . you're not going to go into it but if there's a prior [inconsistent statement] . . . I'll make a ruling from there." Defense counsel answered, "[r]ight, I'm not getting into this report directly."

## III.

During the June 2019 trial, Nina was one of several witnesses called to testify. She told the jury defendant touched her "private part" in June 2018 while she was sitting on a couch and watching a movie with her cousin in the living room of Jane's house. She also stated Jane was the first person she told about the incident.

On cross-examination, Nina stated that after she advised her aunt what happened, Jane asked her to "repeat it, and [she] did." Nina said she did not

A-0791-19

know if she told her aunt defendant touched her more than once in her "private part," but she recalled telling a therapist defendant "touched [her] two times" and "five times." Nina could not recall telling anyone defendant touched her twenty times, but acknowledged on cross-examination that defendant "touch[ed] her] just the one time." On redirect examination, Nina clarified she advised other people defendant touched her two times, because she "didn't really know, so [she] just guessed that time." Likewise, she testified when she told others defendant touched her three and five times, it was because she "still guessed."

Nadia also testified for the State. During her cross-examination, the following exchange occurred:

> DEFENSE COUNSEL: Prior to this incident you had no reason to doubt [defendant's] honesty, is that accurate?
>
> [NADIA]: No.
>
> DEFENSE COUNSEL: You had no reason to doubt that?
>
> [NADIA]: That he's honest?
>
> DEFENSE COUNSEL: Yeah.
>
> [NADIA]: No, I don't think he's honest.
>
> DEFENSE COUNSEL: That's because of this accusation [of sexual assault], right?

[NADIA]:  Before that.

DEFENSE COUNSEL:  From what?

[NADIA]:  Because there was a[n] incident with my mom where she swore he stole money from her and he denied [it] to my sister, and I'm gonna believe my mom. I'm gonna stick by her, and you know, it was a problem never solve[d], so from there I knew that I shouldn't trust him.

DEFENSE COUNSEL:  So that was from the allegation by your mom?

[NADIA]:  Right.

DEFENSE COUNSEL:  And you're gonna believe your mom over [defendant]?

[NADIA]:  Of course.  There's no reason for my mom to lie about money.

DEFENSE COUNSEL:  And [Nina] made an allegation against [defendant]?

[NADIA]:  Yes.

DEFENSE COUNSEL:  And you're gonna believe your daughter over [defendant] no matter what?

[NADIA]:  A hundred percent, yes.

Following Nadia's testimony, the State called Detective Manzo to testify and showed jurors the video recording of his forensic interview with Nina.

11

After the State rested, Jane testified for the defense and recounted Nina's initial disclosure. Jane affirmed that when Nina disclosed the sexual assault, the child stated defendant "touched me in my parts the other day." Jane recalled Nina gestured with her hands pointing down when Jane asked where defendant touched her. According to Jane, Nina also told her defendant touched her "two, three, twenty" times. Jane then spoke with defendant and told him she thought it was best "for him to leave the house until all of this got cleared up." Asked on direct examination "what kind of kid" Nina was, Jane testified Nina was "the type of girl that . . . likes to be the center of everything."

Additional witnesses, including defendant's mother, sister, brother-in-law, sister-in-law, work supervisor, and Jane's stepfather, testified on behalf of defendant. Jane's stepfather stated he now questioned defendant's honesty and believed Nina was telling the truth about defendant sexually assaulting her. However, the balance of defendant's witnesses essentially stated defendant was an honest, hardworking family man and the charges against him did not alter their opinions about defendant.

Defendant also elected to testify on his own behalf and denied the charges against him. Following his testimony, counsel provided closing remarks, during which defendant's attorney highlighted how varied Nina's statements to Jane,

12

Detective Manzo and her therapist were, in terms of how many times defendant touched her "private part." Given her inconsistencies, defense counsel urged the jury to conclude that Nina's testimony regarding defendant touching her one time was "a lie also." Further, defense counsel stated, "[t]here really [was] no corroboration" for Nina's accusation, adding, "how would this child know to make such an accusation? Well, she knows the different parts of the body. . . . And she knows about computers." Defense counsel continued, "why would a seven-year-old-kid make an accusation like this?" Admitting he did not know the answer to this "hard question," defense counsel theorized Nina acted out of revenge, anger, or was "just seeking attention."

Additionally, defense counsel told the jury that of the witnesses who testified, Nadia "was the most hostile here. She even made up a story about [defendant] stealing money from her mother . . . which doesn't make sense."

In her closing remarks, the assistant prosecutor countered that over a period of several months, Nina consistently told various individuals defendant sexually abused her in her aunt's home. The assistant prosecutor also stated Nina endured sitting in a courtroom in the presence of strangers to relay "the embarrassing details of how the defendant, her uncle, touched her on her most private part" and Nina had "absolutely nothing to gain from this." Additionally,

13

the assistant prosecutor rejected defendant's theory that Nina was "some master manipulator," asking the jury, "[w]here would she come up with this story if it were not true? We didn't hear anything about her ever seeing something like this before."

Following their deliberations, the jury acquitted defendant of the first-degree charge but found him guilty of the remaining charges. At sentencing, Judge English merged the endangering charge and sentenced defendant to a six-year term on the sexual assault offense. Before imposing sentence, the judge considered a report from the Adult Diagnostic and Treatment Center (Avenel) finding defendant posed "an average risk of range for sexual recidivism." The judge also found aggravating factors three (risk of re-offense) and nine (deterrence), N.J.S.A. 2C:44-1(a)(3) and (9), and mitigating factors seven (lack of prior criminal history) and eleven (excessive hardship), N.J.S.A. 2C:44-1(b)(7) and (11), applied. He declined to find other mitigating factors, such as mitigating factors eight (the conduct is a result of circumstances unlikely to recur) and nine (defendant's character and attitude indicate he is unlikely to commit another offense), N.J.S.A. 2C:44-1(b)(8) and (9).

IV.

On appeal, defendant raises the following arguments:

POINT I

THE TRIAL COURT IMPROPERLY PRECLUDED DEFENDANT FROM OFFERING EVIDENCE ABOUT COMPLAINANT UNDER N.J.R.E. 404(A)(2) AND N.J.R.E. 402.

POINT II

THE STATE'S SUMMATION WAS UNDULY PREJUDICIAL BECAUSE IT MISUSED EXCLUDED EVIDENCE AND SHIFTED THE BURDEN OF PROOF.  (Not Raised Below).

POINT III

THE TRIAL COURT DEPRIVED DEFENDANT OF HIS RIGHTS TO DUE PROCESS, CONFRONTATION, AND A FAIR TRIAL BY ADMITTING [NINA'S] FORENSIC INTERVIEW AND STATEMENT TO HER AUNT, PURSUANT TO N.J.R.E. 803(C)(27), BECAUSE THE STATEMENTS WERE NOT TRUSTWORTHY.

POINT IV

THE TRIAL COURT ERRED IN ADMITTING A STATEMENT ABOUT DEFENDANT'S PRIOR BAD ACT BECAUSE IT WAS INADMISSIBLE AS HEARSAY AND UNDER N.J.R.E 404(B).  (Not Raised Below).

POINT V

THE CUMULATIVE IMPACT OF THE ERRORS DENIED DEFENDANT DUE PROCESS AND A FAIR TRIAL.  (Not Raised Below).

POINT VI

> DEFENDANT'S SENTENCE IS EXCESSIVE
> BECAUSE THE SENTENCING COURT ERRED
> WHEN IT APPLIED AGGRAVATING FACTOR
> THREE AND WHEN IT FAILED TO APPLY
> MITIGATING FACTORS EIGHT AND NINE.

These arguments are unavailing.

We first address the evidentiary challenges raised under Points I, III and IV. A judge's evidentiary ruling is reviewed "under the abuse of discretion standard because . . . the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)). Thus, we "review a trial court's evidentiary ruling only for a 'clear error in judgment.'" State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)). If we conclude an evidentiary determination constituted an abuse of discretion, "we must then determine whether any error found is harmless or requires reversal." Prall, 231 N.J. at 581. When the trial court fails to apply the proper test in analyzing the admissibility of proffered evidence, our review is de novo. See State v. Lykes, 192 N.J. 519, 534 (2007).

N.J.R.E. 402 provides "[a]ll relevant evidence is admissible, except as otherwise provided in [the Rules of Evidence] or by law." Evidence is relevant

if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. To determine relevancy, a trial judge must "focus on 'the logical connection between the proffered evidence and a fact in issue.'" State v. Covell, 157 N.J. 554, 565 (1999) (quoting State v. Hutchins, 241 N.J. Super. 353, 358 (App. Div. 1990)). "Once a logical relevancy can be found to bridge the evidence offered and a consequential issue in the case, the evidence is admissible, unless exclusion is warranted under a specific evidence rule." State v. Burr, 195 N.J. 119, 127 (2008).

As we have noted, N.J.R.E. 404(a)(2) states, in relevant part: "Evidence of a person's character or character trait . . . is not admissible to prove that on a particular occasion the person acted in conformity with the character or trait except: Evidence of a pertinent trait of character of the victim of the crime offered by a defendant[.]" But N.J.R.E. 405 limits the methods of proving character. While character evidence may be presented in the form of reputation, opinion, or conviction of a crime, specific instances of conduct are not admissible unless a "character or trait of character of a person is an essential element of a charge, claim, or defense." Ibid.

Mindful of these guiding principles, we decline to disturb Judge English's decision to preclude defendant from introducing two sentences from a 2016

Division report that Nina had a "history with Mobile Response services" and "[i]n August 2016, the child was assessed for angry outbursts."

Regarding this evidence, defendant renews the argument he made pretrial, i.e., he should have been permitted to introduce these sentences from the 2016 report to support his defense that Nina "made up her allegations because of her attention-seeking nature." However, we agree with Judge English's holding this information was inadmissible, given defendant failed to prove a logical nexus between Nina's alleged angry outbursts in 2016 and her accusation of sexual assault in 2018. See Hutchins, 241 N.J. Super. at 361-62 (noting "specific instances of a witness's conduct, relevant only insofar as they may tend to prove a trait of . . . character, may not be used to affect credibility"). Stated differently, because the purported instances of conduct, which were not in the form of opinion, reputation or a prior criminal conviction, and were not "an essential element of a charge, claim, or defense," they were inadmissible under N.J.R.E. 405.

We also observe defendant was able to elicit testimony from Jane at trial that Nina was "the type of girl that . . . likes to be the center of everything." Moreover, during his summation, defense counsel told jurors the child lied and may have made up an accusation against defendant because "she was just

A-0791-19

seeking attention." Under these circumstances, even if we determined Judge English's decision to bar the two sentences in the Division report was error – which we do not – we would consider any such error harmless.

Regarding Point III, we are not persuaded the judge erred in permitting Detective Manzo and Jane to testify about Nina's out-of-court statements. As previously discussed, N.J.R.E. 803(c)(27) allows for admission of "a statement by a child under the age of [twelve] relating to sexual misconduct" if the child testifies and "the court finds, in a hearing conducted pursuant to Rule 104(a), that on the basis of the time, content and circumstances of the statement[,] there is a probability that the statement is trustworthy." Courts look to "a non-exclusive list of factors relevant to evaluating the reliability of out-of-court statements made by child victims in sexual abuse, including spontaneity, consistent repetition, mental state of the declarant, use of terminology unexpected of a child of similar age, and lack of motive to fabricate." State. v. P.S., 202 N.J. 232, 249 (2010) (citing Idaho v. Wright, 497 U.S. 805, 821-22 (1990)). Ultimately, however, the admissibility of the child's statement is based on the "totality of circumstances." Id. at 240.

Here, Judge English presided over a Rule 104(a) hearing to assess the trustworthiness of Nina's out-of-court statements. After listening to testimony

from Jane and Detective Manzo, reviewing the video recording of Nina's forensic interview, and hearing argument, the judge made extensive findings on the record before concluding Nina's allegations were sufficiently reliable to present to a jury. These findings are entitled to our deference. See id. at 250-51.

For example, Judge English found Nina spontaneously confided to Jane during a "closed-door discussion" that defendant touched her "private part" and that during her forensic interview, Nina "just . . . came out and said [defendant] touched [her] in [her] private area." The judge also concluded Nina's description of the alleged sexual assault as "weird" "rang very truthful" and "sound[ed] like something that a seven-year-old would say . . . confronted with that situation." Further, the judge determined Nina used anatomical drawings and dolls to indicate where defendant "allegedly put his hand down her pants and . . . under her underwear."

Although the judge found Nina's story contained "some potential inconsistencies," he concluded Nina's statements to Jane and Detective Manzo were admissible, noting the purpose of the hearing was not "to determine [the] credibility of [a] seven-year-old [child]," since that issue could be explored by the defense during Nina's anticipated testimony. See Hisenaj v. Kuehner, 194

N.J. 6, 24 (2008) ("Rule 104 hearings are intended to determine admissibility, not credibility."). Because the judge's findings are amply supported by the record and his legal analysis was sound, there is no basis to disturb his decision to admit Nina's out-of-court statements to Jane and Detective Manzo.

Regarding Point IV, defendant contends the judge erred in allowing Nadia to testify defendant allegedly stole money from her mother. He argues this testimony was "inadmissible both because it was hearsay and because it was evidence of a prior bad act, which is prohibited under N.J.R.E. 404(b)." Because defendant asserts this argument for the first time on appeal, we review it for plain error and "reverse . . . only if the error was 'clearly capable of producing an unjust result.'" State v. Ross, 229 N.J. 389, 407 (2017) (quoting R. 2:10-2). We find no such plain error here.

As evidenced by the exchange we quoted between defense counsel and Nadia, any testimony Nadia relayed about defendant allegedly stealing from her mother was elicited by defense counsel during Nadia's cross-examination. "Trial errors that 'were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal.'" State v. A.R., 213 N.J. 542, 561 (2013) (quoting State v. Corsaro, 107 N.J. 339, 345 (1987)); see also State v. McDavitt, 62 N.J. 35, 48 (1972) (concluding testimony of

defendant's prior crimes did not constitute plain error because defense counsel "provoked the response" during the witness's cross-examination).

The record also reflects Nadia's testimony regarding the alleged theft was not offered for the truth of the matter asserted, N.J.R.E. 801(c)(2); instead, it was used by defense counsel to show Nadia was biased against defendant and thus believed Nina's accusation. Indeed, defense counsel stated in summation, "[Nadia] was the most hostile here. She even made up a story about [defendant] stealing money from [Nina's grandmother]." Additionally, the State did not suggest at any point in the trial that defendant stole money from Nadia's mother. Thus, defendant fails to establish it was plain error for the judge not to preclude Nadia's statements about defendant's alleged theft. R. 2:10-2.

Next, under Point II, defendant raises the argument the assistant prosecutor's closing remarks were "unduly prejudicial" because she "misused excluded evidence to tell jurors a false narrative that [Nina's] only exposure to sexual activity was the instant offense, despite her knowledge to the contrary." To support this argument, defendant points to the assistant prosecutor asking jurors during her summation to ponder "[w]here [Nina] would . . . come up with this story [of sexual assault] if it were not true?" and telling jurors, "[w]e didn't hear anything about [Nina] ever seeing something like this before." Defendant

contends such remarks allowed the assistant prosecutor to "capitalize" on the fact his attorney was barred at trial from using a mental health report — which revealed Nina previously watched a YouTube video of a couple engaging in sexual intercourse. He also newly argues the assistant prosecutor "improperly shifted the burden of proof" when she informed jurors "if there was evidence of an alternate explanation for [Nina's] knowledge of sexual activity, [defendant] would have presented the evidence to the jury."

Because defendant did not object to the challenged remarks at trial, we view his contentions through the prism of the plain error standard. R. 2:10-2. Thus, reversal is inappropriate unless there is a real possibility of injustice "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971).

It is well established prosecutors "are afforded considerable leeway in . . . summations." State v. Williams, 113 N.J. 393, 447 (1988) (citations omitted). "A prosecutor is . . . entitled to argue the merits of the State's case 'graphically and forcefully.'" State v. Smith, 212 N.J. 365, 403 (2012) (quoting State v. Feaster, 156 N.J. 1, 58 (1998)). However, "the primary duty of a prosecutor is not to obtain convictions but to see that justice is done." Id. at 402-03 (citing

State v. Daniels, 182 N.J. 80, 96 (2004)).  If a prosecutor exceeds the bounds of proper conduct, that fact does not end our inquiry "because, in order to justify reversal, the misconduct must have been 'so egregious that it deprived the defendant of a fair trial.'"  State v. Smith, 167 N.J. 158, 181 (2001) (quoting State v. Frost, 158 N.J. 76, 83 (1999)).

An attorney's failure to object to closing remarks "suggests . . . counsel did not believe the remarks were prejudicial at the time they were made."  Frost, 158 N.J. at 84.  "The failure to object also deprives the court of an opportunity to take curative action."  Ibid. (citing State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997)).

Here, the State argued pretrial that Nina's experience with defendant touching her "private part" was quite different from the sexual activity she viewed on the YouTube video.  Also, after addressing this issue with Judge English, defense counsel conceded the mental health report referring to Nina's inadvertent viewing of the YouTube video months before the assault would be used by the defense only for impeachment purposes.  But because none of the State's witnesses testified Nina had never been exposed to sexual activity before the assault, the defense did not address the YouTube video on cross-examination.

Given our review of the record, we are satisfied the assistant prosecutor's summation did not unfairly prejudice defendant, but instead equated to fair comment against defense counsel's closing remarks. See State v. Sinclair, 49 N.J. 525, 548 (1967) ("The prosecutor has the right to make fair comment on the evidence and to argue to the jury the significance of the testimony presented."). Thus, when defense counsel asked jurors, "how would this child know to make such an accusation?" and asked them to conclude Nina lied about the assault, noting she knew "the different parts of the body . . . [a]nd . . . about computers," the assistant prosecutor was entitled to respond to these comments. See State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001) (citations omitted) ("A prosecutor is permitted to respond to an argument raised by the defense so long as it does not constitute a foray beyond the evidence adduced at trial.").

Moreover, we are not persuaded, as defendant argues, the assistant prosecutor's conduct is similar to that found in State v. Garcia, 245 N.J. 412 (2021). In Garcia, defense counsel specifically requested and was denied the admission of a video to corroborate the testimony of his witnesses. Id. at 422-23. Defense counsel here agreed he "wouldn't be offering [this evidence] directly." Also, in Garcia, the prosecutor "advanced an argument he knew to be untrue . . . even though the excluded video he reviewed that very day refuted the

image he conveyed to the jury." Id. at 434. In this matter, however, the assistant prosecutor did not engage in "the purposeful presentation of a fiction to the jury," id. at 435; instead, having previously argued the report of Nina watching the YouTube video was "not on point" and "dissimilar to the conduct" at issue, because there were "no allegations of intercourse in this case," the assistant prosecutor responded to defense counsel's closing remarks but avoided making inaccurate factual assertions.

We also observe Judge English cautioned jurors during the jury charge that "regardless of what counsel said . . . recalling the evidence . . . it is your recollection of the evidence that should guide you as the judges of the facts. Arguments, statements, remarks, openings and summation of counsel are not evidence and must not be treated as evidence." We presume the jurors followed the court's instructions. State v. Montgomery, 427 N.J. Super. 403, 410 (App. Div. 2012) (citing State v. Martini, 187 N.J. 469, 477 (2006)). Accordingly, we are convinced the remarks defendant challenges did not mislead jurors or deprive him of a fair trial.

Similarly, we do not conclude the jurors were misled by the assistant prosecutor's summation to believe defendant bore any burden of proof at trial. Not only did the assistant prosecutor remind jurors during her opening that "the

26

burden . . . is on the State, as in every criminal case," but prior to their deliberations, Judge English explicitly instructed them, "[t]he burden of proving each element of a charge beyond a reasonable doubt rests upon the State, and that burden never shifts to the defendant." We are satisfied those instructions were "sufficient to remove any implication 'that the defense had some burden of proof.'" State v. Patterson, 435 N.J. Super. 498, 513 (App. Div. 2014) (quoting State v. Jenkins, 349 N.J. Super. 464, 479 (App. Div. 2002)).

We need not address defendant's Point V in detail. It suffices to say, defendant has failed to demonstrate harmful error under Points I through IV. Thus, we discern no cumulative error warranting reversal. See State v. Weaver, 219 N.J. 131, 155 (2014) (citation omitted) ("If a defendant alleges multiple trial errors, the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair.").

Finally, defendant argues under Point VI that his sentence is excessive because Judge English mistakenly applied aggravating factor three, and erred by declining to find mitigating factors eight and nine. Again, we disagree.

"Appellate review of the length of a sentence is limited," State v. Miller, 205 N.J. 109, 127 (2011), and "trial courts are given wide discretion [in sentencing] so long as the sentence imposed is within the statutory framework,"

State v. Dalziel, 182 N.J. 494, 500 (2005). We will not disturb the sentencing court's determination unless: "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found . . . were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'" State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

Guided by these standards, we are satisfied defendant's challenge to his six-year prison term is without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(2), and we affirm the sentence substantially for the reasons expressed by Judge English. We add only the following brief comments.

Defendant's sentence falls at the lower end of the permissible statutory range.[4] Also, the record reflects that in finding aggravating factors three and nine, and rejecting mitigating factors eight and nine, Judge English considered defendant's Avenel report to the effect he posed an "average risk . . . for sexual recidivism." The judge also noted defendant's lack of remorse. See State v. Rivera, 249 N.J. 285, 300 (2021) (citing State v. O'Donnell, 117 N.J. 210, 216

---

[4] See N.J.S.A. 2C:43-6(a)(2) (a person convicted of a second-degree crime may be sentenced to a specific term of imprisonment between five and ten years).

(1989)) ("[A] sentencing judge may reasonably find aggravating factor three when presented with evidence of a defendant's lack of remorse.").  Although Judge English also found mitigating factors seven and eleven, he concluded the aggravating factors "[we]re so strong," they "outweigh[ed] the mitigating factors."  The judge's aggravating and mitigating factor analysis is amply supported by the credible evidence in the record.

To the extent we have not addressed defendant's remaining arguments, they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION